**No. 16-1880**

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

HTC CORPORATION, ZTE (USA), INC.,
*Appellants,*

v.

CELLULAR COMMUNICATIONS EQUIPMENT, LLC,

*Appellee.*

On Appeal from the United States Patent & Trademark Office
Patent Trial and Appeal Board No. IPR2014-01134

# APPELLANTS HTC CORPORATION AND ZTE (USA), INC.'S CORRECTED OPENING BRIEF

Steven A. Moore
Matthew R. Stephens
Pillsbury Winthrop Shaw Pittman LLP
501 W. Broadway, Suite 1100
San Diego, CA 92101
(619) 234-5000

*Counsel for HTC Corporation and ZTE (USA), Inc.*

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, Steven A. Moore certifies the following:

1. The full name of the parties represented by me is:

   HTC Corporation and ZTE (USA), Inc.

2. The name of the real party-in-interest (if the party named in the caption is not the real party-in-interest) represented by me is:

   Not applicable.

3. All parent corporations or any publicly held corporations that own 10% or more of the stock of HTC Corporation or ZTE (USA), Inc.:

   HTC Corporation has no parent corporation, and there is no publicly-held corporation that owns 10% or more of HTC Corporation's stock.

   ZTE (USA), Inc. is a wholly-owned subsidiary of ZTE Corporation, which is a publicly-traded corporation.

4. The names of all law firms and the partners or associates that appeared for the party now represented by me in this proceeding are:

   Richard W. Thill

/s/ *Steven A. Moore*
Steven A. Moore

August 15, 2016

## TABLE OF CONTENTS

**Page**


INTRODUCTION ..... 1

JURISDICTION ..... 3

ISSUES PRESENTED FOR REVIEW ..... 3

STATEMENT OF THE CASE ..... 4

A. Background of the Relevant Technology ..... 4

B. The '174 Patent ..... 7

C. The Challenged Claims ..... 14

D. The Asserted Prior Art ..... 16

1. U.S. Patent Application Publication No. 2008/0151840 to Baker ..... 16

2. U.S. Patent No. 7,689,239 to Reed ..... 19

3. U.S. Patent No. 7,321,780 to Love ..... 21

E. The Proceedings Below ..... 21

SUMMARY OF THE ARGUMENT ..... 31

STANDARD OF REVIEW ..... 33

ARGUMENT ..... 34

I. The Board Erred by Construing "Message" According to Its Content and Requiring an Unspecified Beginning and Endpoint ..... 34

A. The '174 Patent's Claims Discuss "Message" in the Context of "*the Start of a Message Transmission*" ..... 37

B. Nothing in the Specification Supports the Board's Construction of "Message" ..... 38

C. Baker Anticipates Under the Proper Understanding of "Message" ..... 42

II. Baker Anticipates the '174 Patent Even under the Board's Erroneous Construction of "Message" ..... 43

## TABLE OF CONTENTS
## (continued)

**Page**

III. The Board Erred in Finding Reed Does Not Render Obvious the Use of a Single Headroom for a Plurality of Codes ................. 46

CONCLUSION ........................................................................................ 50

# TABLE OF AUTHORITIES

## Cases

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
457 F.3d 1293 (Fed. Cir. 2006) .......... 37

*Cuozzo Speed Techs., LLC v. Lee*,
136 S. Ct. 2131 (2016) .......... 35

*Facebook, Inc. v. Pragmatus AV, LLC*,
582 Fed. Appx. 864 (Fed. Cir. 2014) .......... 35

*Funai Elec. Co. v. Daewoo Elecs. Corp.*,
616 F.3d 1357 (Fed. Cir. 2010) .......... 39

*In re Moutett*,
686 F.3d 1322 (Fed. Cir. 2012) .......... 33

*In re Zletz,*
893 F.2d 319 (Fed. Cir. 1989) .......... 34

*Info-Hold, Inc. v. Applied Media Techs. Corp.*,
783 F.3d 1262 (Fed. Cir. 2015) .......... 33

*Kennametal, Inc. v. Ingersoll Cutting Tool Co.*,
780 F.3d 1376 (Fed. Cir. 2015) .......... 33

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) .......... 35

*PPC Broadband, Inc. v. Corning Optical Communications RF, LLC*,
815 F.3d 747 (Fed. Cir. 2016) .......... 38, 39

*Regents of the Univ. of Minn. v. AGA Med. Corp.*,
717 F.3d 929 (Fed. Cir. 2013) .......... 34

*Respironics, Inc. v. Zoll Med. Corp.*,
No. 2015-1485, 2016 WL 4056094 (Fed. Cir. July 29, 2016) .......... 35

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
135 S.Ct. 831 (2015) .......... 33

## TABLE OF AUTHORITIES
## (continued)

**Page**

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996) .......... 38

### Statutes and Codes

United States Code
Title 28, section 1295(a)(4)(A) .......... 3

United States Code
Title 35, section 102(a) .......... 4, 32

United States Code
Title 35, section 103 .......... 3, 4, 33, 46

United States Code
Title 35, section 141(c) .......... 3

United States Code
Title 35, section 318(a) .......... 3

### Rules and Regulations

Code of Federal Regulations
Title 37, section 42.100(b) .......... 34

Code of Federal Regulations
Title 37, section 90.2 .......... 3

## STATEMENT OF RELATED CASES

United States Patent No. 7,941,174 is presently the subject of the following patent infringement lawsuits, all brought by Cellular Communications Equipment LLC in the Eastern District of Texas:

| NAME | CASE NO. | TRIBUNAL | FILED |
|---|---|---|---|
| Cellular Communications Equipment LLC v. HTC Corporation et al | 6-16-cv-00475 | E.D. Tex. | 05/31/2016 |
| Cellular Communications Equipment LLC v. ZTE Corporation et al | 6-16-cv-00476 | E.D. Tex. | 05/31/2016 |
| Cellular Communications Equipment LLC v. ZTE Corporation et al | 6-16-cv-00375 | E.D. Tex. | 04/25/2016 |
| Cellular Communications Equipment LLC v. HTC Corporation et al | 6-16-cv-00363 | E.D. Tex. | 04/20/2016 |
| Cellular Communications Equipment LLC v. Samsung Electronics Co., Ltd et al | 6-16-cv-00364 | E.D. Tex. | 04/20/2016 |
| Cellular Communications Equipment LLC v. Pantech Co. Ltd. | 6-15-cv-00853 | E.D. Tex. | 09/14/2014 |
| Cellular Communications Equipment LLC v. Samsung Electronics Co., Ltd et al | 6-14-cv-00759 | E.D. Tex. | 09/15/2014 |
| Cellular Communications Equipment LLC v. Apple Inc. et al | 6-14-cv-00251 | E.D. Tex. | 04/07/2014 |
| Cellular Communications Equipment LLC v. Apple Inc. et al | 6-14-cv-00031 | E.D. Tex. | 01/17/2014 |

| | | | |
|---|---|---|---|
| Cellular Communications Equipment LLC v. Microsoft Corp. | 6-13-cv-00738 | E.D. Tex. | 10/01/2013 |
| Cellular Communications Equipment LLC v. NEC Casio Mobile Communications Ltd. et al | 6-13-cv-00584 | E.D. Tex. | 08/07/2013 |
| Cellular Communications Equipment LLC v. Amazon.com Inc. | 6-13-cv-00568 | E.D. Tex. | 08/02/2013 |
| Cellular Communications Equipment LLC v. Dell Inc. | 6-13-cv-00569 | E.D. Tex. | 08/02/2013 |
| Cellular Communications Equipment LLC v. Motorola Mobility LLC et al | 6-13-cv-00572 | E.D. Tex. | 08/02/2013 |
| Cellular Communications Equipment LLC v. HTC Corporation et al | 6-13-cv-00507 | E.D. Tex. | 06/25/2013 |
| Cellular Communications Equipment LLC v. LG Electronics, Inc. et al | 6-13-cv-00508 | E.D. Tex. | 06/25/2013 |
| Cellular Communications Equipment LLC v. Pantech Co., Ltd. et al | 6-13-cv-00509 | E.D. Tex. | 06/25/2013 |
| Cellular Communications Equipment LLC v. BlackBerry Limited et al | 6-13-cv-00510 | E.D. Tex. | 06/25/2013 |
| Cellular Communications Equipment LLC v. ZTE Corporation et al | 6-13-cv-00511 | E.D. Tex. | 06/25/2013 |

## INTRODUCTION

Appellee Cellular Communications Equipment ("CCE"), a subsidiary of Acacia Research Corporation, is a patent licensing entity that manages an international patent portfolio related to wireless equipment technology. In June 2013 it sued HTC Corporation and ZTE (USA), Inc. ("Appellants"), among others, in the Eastern District of Texas for infringement of six patents, including U.S. Patent No. 7,941,174 B2 (the "'174 Patent"). The '174 Patent relates to a power control method for devices operating in a mobile radio communication system.

On July 10, 2014, Appellants petitioned the Patent Trial and Appeal Board ("PTAB") for *Inter Partes* Review ("IPR) of the '174 Patent. [Petition at 1, Appx247]. The Petition asserted (1) Claims 1, 6, 9, 14, 18, and 19 are unpatentable as anticipated by U.S. Patent Application Publication No. 2008/0151840 ("Baker"); (2) Claims 1, 6, 9, 14, 18, and 19 are unpatentable as obvious over a combination of U.S. Patent No. 7,689,239 ("Reed") and Baker; (3) Claims 1, 6, 9, 14, 18, and 19 are unpatentable as obvious over a combination of Reed and U.S.

Patent No. 7,321,780 ("Love"); and (4) Claims 1, 6, 9, 14, 18, and 19 are unpatentable as anticipated by Love.

The Board received briefing and held oral hearing on August 26, 2015. On January 6, 2016, the Board issued a final written decision holding that Appellants failed to show that any of the challenged claims were unpatentable.

The Board's determination regarding anticipation by Baker was based on its erroneous construction of the challenged claims. The Board construed the challenged claims to require that the recited "message" claim term to mean a set of data having a beginning and an unspecified end. Neither the text of the claims nor the specification supports this understanding of "message," which is consistently described within the context of data transmissions at intervals in a Universal Mobile Telecommunications System ("UMTS") system using Code Division Multiple Access ("CDMA") protocols. In any event, the prior art clearly teaches determining a power transmit difference at the start of a message transmission, because a "message" transmission will invariably commence at a frame or timeslot boundary in a UMTS system. As the Board's erroneous claim construction and application

thereof was the sole basis for its decision, that decision should be reversed.

The Board's decision regarding obviousness of the '174 Patent was similarly flawed and ignores the clear teachings of Reed contemplating the use of a single power headroom to de-prioritize one data stream in favor of boosting the available transmit power of another. Thus, Reed in combination with Baker, or alternatively, with Love would render the purported invention in the '174 Patent "obvious . . . to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103. The Board's decision in this regard should therefore be reversed.

## JURISDICTION

This appeal is from the PTAB's final written decision of January 6, 2016 in IPR2014-01134. The PTAB had jurisdiction under 35 U.S.C. § 318(a). Appellants filed a timely notice of appeal under 35 U.S.C. § 141(c) and 37 C.F.R. § 90.2 on March 9, 2016. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(c).

## ISSUES PRESENTED FOR REVIEW

1. Whether the Board erred by failing to apply the broadest reasonable construction of the term "message" in the '174 Patent and

thereby concluding that Appellants did not prove by a preponderance of evidence that Claims 1, 6, 9, 14, 18, and 19 of the '174 Patent are unpatentable under 35 U.S.C. § 102(a) as anticipated by Baker.

2. Whether the Board's conclusion that Appellants did not prove by a preponderance of evidence that Claims 1, 6, 9, 14, 18, and 19 of the '174 Patent are unpatentable under 35 U.S.C. § 102(a) as anticipated by Baker even under its own erroneous construction of "message" is supported by substantial evidence.

3. Whether the Board's conclusion that Appellants did not prove by a preponderance of evidence that Claims 1, 6, 9, 14, 18, and 19 of the '174 Patent are unpatentable under 35 U.S.C. § 103 as obvious over Reed in combination with Baker or Reed in combination with Love is supported by substantial evidence.

## STATEMENT OF THE CASE

### A. Background of the Relevant Technology

United States Patent No. 7,941,174 B2 to Breuer et al. ("Breuer" or "the '174 Patent") concerns a power control method for devices operating in a mobile radio communication system. According to the patent, the alleged invention has particular relevance to radio communications systems and, specifically, a UMTS radio

communication system using CDMA multiple access protocols. The patent explains:

> With code division multiple access methods, subscriber-specific codes are used for communication with subscriber stations, with the result that in the downlink direction the respective subscriber station or, as the case may be, in the uplink direction network-side devices can differentiate the messages to or from the subscriber station from the messages to or from other subscriber stations by establishing a correlation between the received signal and the subscriber-specific code. It is possible for a subscriber station to use a plurality of codes for transmitting messages. In this case the different codes serve to distinguish different transmission channels used by the subscriber station, such as, for example, to distinguish between channels for transmitting payload and signaling information, or to distinguish channels of different services.

['174 Patent at 1:59-2:6, Appx30].

The basic principles of transmitting data in a UMTS system using CDMA are undisputed. The essential constituent elements in such a system include radio base stations, which communicate with "mobile devices, i.e. subscriber stations, to provide direct access to the core telecommunications network." [Declaration of Dr. Tim A. Williams ("Williams Decl.") p. 10 ¶ 29, Appx794]. In a UMTS system, data is transmitted between the base station and the subscriber stations via an air interface over coded channels "dedicated to data transmitted to and

from a single subscriber station." [Williams Decl. p. 12 ¶¶ 33-34, Appx796]. The channel architecture in UMTS systems is divided into logical, transport, and physical layers. [Williams Decl. p. 12 ¶ 33, Appx796]. As is relevant to the '174 Patent, the codes may comprise a Dedicated Control Channel ("DCCH") on the logical layer, a Dedicated Channel ("DCH") on the transport layer, and a Dedicated Physical Data Channel ("DPDCH") on the physical layer. [Williams Decl. p. 10 ¶ 34, Appx796]. Additionally, an Enhanced Dedicated Channel ("EDCH") code is available in UMTS systems for higher data rate traffic. [*Id.*].

Transmissions in a UMTS system occur at designated frames or timeslots. In the '174 Patent, these are described as Time Transmission Intervals ("TTI"). *See* ['174 Patent at 4:42-44, 65-67; 5:29-48, Appx31-32]. "A UMTS frame is 10ms long and a message in a UMTS system can include one or more frames (each frame having 15 time slots)." [Second Declaration of Dr. Tim A. Williams ("Williams Second Decl.") at pp. 5-6 ¶ 11, Appx1181-1182]; *see also* [Declaration of Dr. Esmael Dinan ("Dinan Decl.") at p. 11 ¶25, Appx2126] ("UMTS uses CDMA techniques as its multiple access technology, but it additionally uses time division techniques with a time-slot and frame structure to provide a channel

structure. A physical channel is divided into 10 ms frames, each of which has fifteen time-slots each of 666 micro-seconds length.").

### B. The '174 Patent

The '174 Patent issued May 10, 2011. It originated from a PCT application filed October 6, 2005, and claims priority to a foreign application dated November 11, 2004. ['174 Patent, Appx28]. Breuer is directed to a "method for multicode transmission by a subscriber station," at term which is generally synonymous with "user equipment" or more simply, a "cellular telephone." *See* [*Id.*]. The '174 Patent essentially describes a power control method in a Universal Mobile Telecommunications System (UMTS) radio communication system with a subscriber station (i.e., user equipment) and a base station. *See* ['174 Patent at 3:12-15; 4:26-28, Appx31]. The '174 Patent's stated objective is to provide "an efficient method for operating a radio communication system wherein a subscriber station is assigned a first and a second code for the purpose of transmitting messages," as seen in Figure 1:




*See* [2:10-13; Fig. 1, Appx29].

In the claimed methods, a base station sends power control instructions at regular intervals to the subscriber station. *See* ['174 Patent at 4:41-46, Appx31]. The power control instructions indicate "whether the transmit power is to be increased or decreased by the subscriber station." ['174 Patent at 4:41-46, Appx31]. In deteriorating channel conditions, the base station may instruct the mobile station to increase its transmit power. ['174 Patent at 4:47-50, Appx31]. The subscriber station has a maximum transmit power, however, above which it cannot increase the transmit power even at the base station's instruction. ['174 Patent at 4:50-51, Appx31]. If a greater increase is required, the subscriber station may need to abort the transmission.

The ‘174 Patent describes aborting a message transmission in a UMTS system as particularly disadvantageous for "wasting radio resources" and generating interference "due to the incomplete transmission." [‘174 Patent at 6:1-5, Appx32].

The ‘174 Patent recognizes the subscriber station is more likely to reach its maximum transmit power when using multiple transmission channels, designated as "codes," than in a system where the subscriber station transmits data over a single code. *See* [‘174 Patent at 5:1-28, Appx32]. "Codes" in the context of the patent "distinguish between channels for transmitting payload and signaling information, or to distinguish channels of different services." [‘174 Patent at 2:3-5, Appx30].

The patent discloses an embodiment in which the subscriber station uses two recognized codes in a UMTS system, *e.g.*, the Dedicated Channel ("DCH") and the Enhanced Dedicated Uplink Channel ("EDCH"). The DCH may be a "dedicated channel" as described in 3GPP TS 25.211 V6.2.0, 3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Physical channels and mapping of transport channels onto physical channels (FDD), a

telecommunications standard. [*Id.* at 4:26-37, Appx31]. The EDCH code "is assigned to the subscriber station UE, in particular, for transmitting high bit rate traffic." ['174 Patent at 4:38-40, Appx31]. Although the patent only discloses this single embodiment, it clarifies "that variations and modifications can be effected within the spirit and scope of the claims." ['174 Patent at 9:48-50, Appx34].

The patent acknowledges that message transmissions begin at certain Time Transmission Intervals ("TTI") during which the base station sends "power control instructions, the TPC bits." *See* ['174 Patent at 4:42-44, 65-67; 5:29-48, Appx31-32]. In an explicit example, the patent specifies the "length of an EDCH message (TTI: Transmission Time Interval) is 10 ms. During this time the subscriber station UE receives 15 TPC bits." ['174 Patent at 5:29-31, Appx32]. In response to power control instructions from the base station, the subscriber station may adjust its transmit power or, alternatively, the Transport Format Combination ("TFC"). ['174 Patent at 4:52-55, Appx31]. "[T]he TFC specifies the ratio of coded data, i.e. the total data, to the payload data, and consequently the data rate" that is transmitted from the subscriber station to the base station. ['174 Patent at 4:55-58,

Appx31]. Thus, the subscriber station may increase the transmit power or adjust the TFC to comply with instructions to increase the transmit power. But the "switching of a TFC can only take place at specific times, and moreover at specific TTI limits." ['174 Patent at 4:64-66, Appx31]. For instance, "[t]he TFC for the code EDCH cannot be changed during the TTI . . . adjusting the TFC for the code EDCH is not possible during the transmission of an EDCH message." ['174 Patent at 5:31-36, Appx32]. Similarly, the TFC for the code DCH can only "be switched by the subscriber station UE at the start of a TTI for the code DCH." ['174 Patent at 5:39-40, Appx32].

Thus, in the only disclosed embodiment, if a subscriber station transmits the two codes and reaches its maximum transmit power during the transmission of an EDCH message, it must either abort the EDCH transmission or reduce the transmission rate on the DCH channel if the base station instructs the subscriber station to further increase its transmit power. ['174 Patent at 5:54-6:6, Appx32]. If the subscriber station is already transmitting on the DCH channel at the lowest possible rate, it must abort the EDCH transmission, because the

DCH connection with the base station is "indispensable." ['174 Patent at 5:54-6:1, Appx32].

To avoid wasting radio resources and generating interference, the claimed method requires a "transmit power difference" – or "power headroom" – to exist between the difference of the maximum transmit power of the subscriber station and the total transmit power for the transmitting codes at the start of the transmission of a message. *See* ['174 Patent at 6:42-47, Appx32]. In the disclosed embodiment, this "transmit power difference . . . corresponds to an unused transmit power at the start of the transmission of an EDCH message." ['174 Patent at 6:47-49, Apx32].

The '174 Patent discloses that the base station or the subscriber station may determine the transmit power difference. The base station can determine the transmit power difference by considering a number of parameters, such as the type of cell ("capacity limited" not requiring a large power headroom versus "coverage limited" requiring a large power headroom) ['174 Patent at 7:6-28, Appx33], the current interference of a cell (the greater the interference, the higher the transmit power difference should be) ['174 Patent at 7:29-33, Appx33], the service used

by subscriber station (realtime services requiring a high transmit power difference versus non-realtime services requiring a low transmit power difference) ['174 Patent at 7:54-8:7, Appx33], the strategy of the network operator (requiring low transmit power difference if a high data throughput is to be achieved overall for all users via EDCH) ['174 Patent at 8:8-12, Appx33], and the class of the subscriber station (higher priority class requiring lower transmit power difference versus lower priority class requiring higher transmit power difference) ['174 Patent at 8:13-17, Appx33].

If the subscriber station determines the power transmit difference, it "can take into account the instructions received in the past concerning the transmit power control in relation to the code DCH, i.e. the TPC bits." ['174 Patent at 9:26-28, Appx34]. In this embodiment, "the variance of the transmit powers of a first channel . . . is used to determine the transmit power for a second channel." ['174 Patent at 9:36-39, Appx34]. To determine the transmit power of the second code, the subscriber station evaluates "the transmit power difference, the current value of the transmit power for the code DCH, the TFC for the code EDCH, the maximum value of which is predefined for it by the

base station NODE B, its maximum transmit power for multicode transmission, and the current radio transmission conditions." ['174 Patent at 9:41-46, Appx34].

Once the transmit power difference is established, the claimed methods require the subscriber station to maintain it, such "that the sum formed from the transmit powers for the two codes DCH and EDCH at the start of the transmission of the EDCH message differs from the maximum transmit power available for the two codes DCH and EDCH precisely by the transmit power difference, or that the transmit power difference . . . represents a minimum value which must be present at least between the sum of the transmit powers for the two codes DCH and EDCH at the start of the transmission of the EDCH message and the maximum transmit power available for the two codes DCH and EDCH." ['174 Patent at 8:50-63, Appx33].

### C. The Challenged Claims

Claims 1, 6, 9, 14, 18, and 19 (the "Challenged Claims") are at issue in this appeal. Claims 1, 9, and 18 are independent:

> 1. A method for operating a radio communication system in which a subscriber station is assigned a plurality of codes for transmitting messages, comprising:

> determining a transmit power difference which is to be maintained by the subscriber station between on one hand a total maximum transmit power of the subscriber station for the codes and on another hand a total transmit power of the subscriber station for the codes at a start of a message transmission using a first one of the codes.

9. A method for operating a radio communication system in which a subscriber station is assigned a plurality of codes for transmitting messages, comprising:

> maintaining a previously determined transmit power difference by the subscriber station between on one hand a total maximum transmit power of the subscriber station for the codes and on another hand a total transmit power of the subscriber station for the codes at a start of a message transmission using a first one of the codes.

18. A subscriber station for a radio communication system, the subscriber station assigned a plurality of codes for transmitting messages, comprising:

> at least one processor programmed to determine a transmit power difference which is to be maintained by the subscriber station between on one hand a total maximum transmit power of the subscriber station for the codes and on another hand a total transmit power of the subscriber station for the codes at a start of a message transmission using a first one of the codes.

The remaining challenged claims are dependent. Claim 6 depends from Claim 1, and recites:

6. The method as claimed in claim 1, wherein said determining of the transmit power difference is performed by the subscriber station.

Claim 14 depends from Claim 9:

> 14. The method as claimed in claim 9, wherein said determining of the transmit power difference is performed by the subscriber station.

Claim 19 depends from Claim 18:

> 19. A subscriber station as claimed in claim 18, wherein said at least one processor is further programmed to maintain the transmit power difference.

### D. The Asserted Prior Art

#### 1. U.S. Patent Application Publication No. 2008/0151840 to Baker

U.S. Patent Application Publication No. 2008/0151840 to Baker claims a "communication system and method of operating the communicating system" that has "particular, but not exclusive, application to spread spectrum systems such as UMTS." [Baker [0001], Appx913]. Baker recognizes that "[i]n a communication system while a terminal is transmitting a first signal, it is sometimes necessary to transmit simultaneously additional signals which would require the terminal's maximum transmit power limit to be exceeded." [Baker [0003], Appx913]. Baker proposes a solution that "includ[es] reducing the transmit power of the first signal in order to allow sufficient power for the additional signal(s) to be transmitted without breaching the

maximum power limit or switching-off part or all of the first signal in order to allow the additional signal(s) to be transmitted." [Baker [0003], Appx913].

Baker further notes "[i]n some systems, it is only possible to execute the reduction in transmit power of the first signal at particular time instants, such as a ***frame- or timeslot boundary***. These time instants may not correspond to the times at which the transmission of the additional signal(s) must commence." [Baker [0004]] (emphasis added). Baker explains that a solution to this problem "is to execute a reduction in transmit power in advance of the transmission of the additional signal(s)." [Baker [0004], Appx913].

Baker teaches that in the disclosed system "[t]wo signals are often transmitted continuously [–] a dedicated physical data channel (DPDCH) and dedicated physical control channel DPCCH." [Baker [0023], Appx914]. Baker further discloses that "[t]hese signals are formatted into successive frames or time slots whose duration is specified by the system." [Baker [0023], Appx914]. In the preferred embodiment, the mobile station (subscriber station) must transmit "additional signals" in response to a packet periodically transmitted by

the base station using High-Speed Downlink Packet Access (HSDPA) consisting of a positive (ACK) or negative (NACK) acknowledgement. [Baker [0024], Appx914]. The transmission times for the ACK and NACK signals may not be aligned with those of the DPCCH or DPDCH, such that it is necessary to reduce their transmit power for the DPCCH or DPDCH at the frame- or timeslot boundary before the ACK or NACK transmission. [Baker [0027, 0030], Appx914]. This is illustrated by Figure 4:




FIG. 4

Moreover, as Figure 4 further indicates, Baker teaches maintaining the headroom at least until the next frame- or timeslot boundary in which the next the DPCCH or DPDCH transmission may begin.




FIG. 4

Finally, Baker discloses:

> When implementing the method in accordance with the present invention the scaling of the DPCCH power may coincide with a requested power increase, for example due to a closed loop power control process or a change in data format on the DPDCH. In this case, the result of the scaling process in accordance with the present invention may in fact be to increase the DPCCH (+DPDCH) transmit power, but by a smaller amount than was requested by the closed loop power control process and/or change in DPDCH data format. This situation may arise where the sum of PC1 and PD1 is less than Pmax, but the sum of PC2+PD2+the greater of PA and PN would be greater than Pmax if the scaling were not applied.

[Baker [0032], Appx915]. Thus, Baker describes that the two codes (DPCCH and DPDCH) can be transmitted using less power than the maximum transmit power for the subscriber station.

### 2. U.S. Patent No. 7,689,239 to Reed

The invention in Reed is directed to power control in wireless communications and discloses determining and maintaining power headroom for transmissions between a mobile station and a base station

using codes in CDMA (as well as other protocols) wireless communication systems. *See* [Reed Abstract, 2:20-28, Appx905]. Reed describes headroom in the same manner as the '174 Patent: "[h]eadroom is the difference between the maximum power of the transmitter and the transmission power level required for a particular data rate." [Reed 1:29-31, Appx905]. It further discloses:

> If the mobile station desires to send two or more data streams (or hold voice and data connections at the same time), an addition[al] degree of freedom allows the mobile station to deliberately increase the headroom on one of the data streams to de-prioritize that data stream. This would result in, for example, a longer time to transmit a text message from the mobile station but allow a digital picture to be transmitted at an optimum data rate.

[Reed 4:14-21, Appx906].

The "additional degree of freedom" Reed provides is that one data stream can be de-prioritized for the benefit of another data stream. Reed further clarifies the headroom is calculated according to the mobile station's "available transmit power" – rather than an individual data stream. [Reed 4:59-65, Appx906] ("after the base station receives the data transmission request . . . the base station obtains the ***mobile station's available transmit power*** . . . In step 360, the base station determines the data rate ***for the mobile station*** based on the

headroom . . . and ***the mobile station's available transmit power***.") (emphasis added).

**3. U.S. Patent No. 7,321,780 to Love**

Love is directed to choosing a transmission rate for an enhanced uplink dedicated transport channel (EUDCH) transmission in a UMTS system from a mobile station ("MS") to a base station, in light of the maximum power available to the mobile station for transmission of multiple codes and the amount of power being used to transmit data on other channels such as DPCCH, HS-DPCCH, or DPDCH. [Love Abstract, 1:7-10, 4:2-21, 9:54-59, 10:1-7, Appx917, Appx923-924, Appx927].

**E. The Proceedings Below**

On July 10, 2015, Appellants petitioned for *Inter Partes* Review ("IPR") of the '174 Patent. [Petition at 1, Appx252]. The Petition asserted (1) Claims 1, 6, 9, 14, 18, and 19 are unpatentable as anticipated by Baker; (2) Claims 1, 6, 9, 14, 18, and 19 are unpatentable as obvious over a combination of Reed and Baker; (3) Claims 1, 6, 9, 14, 18, and 19 are unpatentable as obvious over a combination of Reed and Love; and (4) Claims 1, 6, 9, 14, 18, and 19 are unpatentable as anticipated by Love. [Petition].

In the Petition, Appellants asserted Baker disclosed all elements of the '174 Patent's Challenged Claims. [Petition at 20-27, 51-54, Appx271-278, Appx302-305]. In particular, the Petition indicated Baker "has particular . . . application to spread spectrum systems such as UMTS (Universal Mobile Telecommunications System)." [Petition at 20; Baker at [0001], Appx271]. Appellants argued that Baker, like the '174 Patent, discloses use of a plurality of codes as transmission channels as well as determining and maintaining a headroom as in the claimed methods. [Petition at 21, Appx272]. Further, the Petition in no uncertain terms asserted Baker discloses maintaining a power difference at the start of a frame boundary in a UMTS system – not merely on a timeslot-by-timeslot basis:

> In FIG. 4 the broken horizontal line illustrates the maximum allowed transmit power Pmax. When there is not ACK or NACK to be transmitted then the combined maximum amplitudes of PD1 and PC1 equal Pmax. However at the at the ***boundary of the frame*** or time slot immediately preceding the sending of an ACK or NACK, these amplitudes are adjusted by for example reducing DPCCH whilst maintaining the power ratio PD/PC constant. Thus capacity is left for the transmission of the higher power one of ACK or NACK, even though the lower power one may be transmitted thereby making the combined transmit power lower than Pmax.

[Petition at 52 (quoting Baker [0030]), Appx303] (emphasis added).

Appellants additionally argued that Reed discloses a CDMA wireless communication system in which "the mobile station is capable of modifying its headroom under various predetermined conditions." [Petition at 28 (quoting Reed at 4:6-8), Appx279]. Further, Appellants demonstrated Reed teaches the mobile station can "send two or more data streams" and can adjust the "headroom on one of the data streams to deprioritize that data stream . . . result[ing] in, for example, a longer time to transmit a text message but allow a digital picture to be transmitted at an optimum rate." [Petition at 28-29 (quoting Reed at 4:14-22), Appx279-280]. In light of Baker's disclosure of assigning codes to transmission channels, Appellants argued "it would have been obvious to one skilled in the art to understand that the two or more data streams transmitted by the mobile station in Reed can be transmitted on different channels using codes." [Petition at 29, Appx280].

The Board instituted IPR of Claims 1, 6, 9, 14, 18, and 19 of the '174 Patent on the grounds that the challenged claims are unpatentable as anticipated by Baker and obvious over a combination of Reed and Baker and a combination of Reed and Love. [Institution Decision at 16-

17, Appx380-381]. Although the Board discussed claim construction of the terms listed below, it declined to expressly construe any of the terms in the '174 Patent:

| Claim Term | Appears in Claim[s] |
|---|---|
| "maintain[ed/ing]" | All challenged claims |
| "the codes" | Claims 1, 9, and 18 |
| "determin[ing/e] a transmit power difference which is to be maintained . . . between . . . a total maximum transmit power of the subscriber station for the codes and . . . a total transmit power of the subscriber station for the codes" | Claims 1 and 18 |
| maintaining a previously determined transmit power difference . . . between . . . a total maximum transmit power of the subscriber station for the codes and . . . a total transmit power of the subscriber station for the codes | Claim 9 |
| "total maximum transmit power of the subscriber station for the codes" | Claims 1, 9, and 18 |
| "total transmit power of the subscriber station for the codes" | Claims 1, 9, and 18 |

[Institution Decision at 5-8, Appx369-372].

Patent Owner argued in its Response that Baker does not anticipate the '174 Patent because it does not disclose the "determining the transmit power . . . at the start of a message" limitation. [Response

at 35, Appx502]. Patent Owner alleged Petitioners "pick[ed] an arbitrary time slot in Baker and designate[d] that as 'the start of a message.'" [Response at 35, Appx502]. In particular, Patent Owner asserted "time slots themselves are not messages." [*Id.* at 36, Appx503]. In support, Patent Owner acknowledged the '174 Patent describes "an EDCH message is 10 ms long and, consequently, is made of up [sic]15 time slots." [*Id.*]. On this basis, Patent Owner concluded, "Other messages may be longer or shorter, but there is no reading of the '174 Patent that indicates that a 'message' can be any arbitrary point in a data stream like what is shown in Baker's Fig. 4." [*Id.*]. Patent Owner additionally argued Reed does not render the '174 Patent obvious because it purportedly does not teach the use of a single headroom for the two disclosed data streams. [Response at 38-39, Appx505-506].

In reply, Appellants reiterated that Baker satisfies the "start of a message" limitation. In particular, "Baker discloses that the transmit power can be determined not only at a timeslot boundary but also at a frame boundary." [Petitioners' Reply at 10, Appx582]. And the '174 Patent unequivocally describes a "message" lasting a single frame – 10 ms during which 15 timeslots elapse. [Petitioners' Reply at 9,

Appx583]. Second, Appellants argued the mobile station in Reed reserves headroom for the entire device, rather than just for an individual code the mobile station may be transmitting.

Appellants submitted a declaration from Dr. Tim Williams along with the reply explaining that "Baker discloses determining a transmit power difference at a "frame-boundary," not just at time-slot boundaries as Dr. Dinan asserts." [Williams Second Decl. ¶10, Appx1181]. Dr. Williams clarified "Baker's disclosure of maintaining transmit power difference at a 'frame-boundary' is equivalent to maintaining a transmit power difference at a start of a message in the '174 patent." [Williams Second Decl. ¶11, Appx1181-1182]. He further opined:

> A person of ordinary skill in the art would understand that [Reed] explains that more power can be allocated to higher-priority data streams by reducing power allocated to lower priority data streams.

[Williams Second Decl. ¶13, Appx1183]. Dr. Williams indicated that a person of ordinary skill:

> [A]fter reading Reed, which describes a subscriber station reserving headroom for the device that can be transmitting multiple data streams, would know, at least from Baker and Reed, that data streams are transmitted using different codes and would know to use the total power of the codes being transmitted in calculating the headroom reservation.

[Williams Second Decl. ¶17, Appx1185].

The Board held a hearing on August 26, 2015. During the Oral Hearing, Patent Owner contended that Baker did not anticipate the Challenged Claims of the '174 Patent for, *inter alia*, allegedly not disclosing a "message" within the meaning of the '174 Patent. The Patent Owner offered several proposed constructions of the term "message" at the hearing, none of which had been previously disclosed to Appellants or the Board:

| **Patent Owner's Proffered Claim Constructions of "Message"** | |
|---|---|
| "[A] message is a discreet packet of information . . . that . . . has a beginning and an end . . ." | [Oral Hearing at 37:2-9, Appx722]. |
| "Typically, messages are much longer than a single timeslot. They can span multiple timeslots, as described in the '174 patent." | [Oral Hearing at 38:3-5, Appx723]. |
| "if the reference says, like the '174 patent, this is a message, then that's a message." | [Oral Hearing at 38:18-20, Appx723] |
| "And you can look at . . . .if somebody's sending packet data, or whatever the data is, the nature of what is being sent . . . is that a message? Does it have a beginning? Does it have an end? Is it some logical group of data . . . an e-mail message, a text message. . . [T]he ordinary meaning of message | [Oral Hearing at 38:20-39:10, Appx723-724]. |

| | |
|---|---|
| is some related data that has a beginning and has an end." | |
| "the '174 patent talks about 15 slots equals the – length of this message." | [Oral Hearing at 32:20-33:2, Appx717-718]. |
| "a continuous set of data that has a beginning and an end. It starts with something, and it ends with something, and it's some related set of data." | [Oral Hearing at 32:2-5, Appx717] |

Importantly, Patent Owner conceded "a message . . . [i]n the '174 patent, it's described as an EDCH message, a particular type of message under the UMTS protocols." [Oral Hearing at 31:16-19, Appx716]. Patent Owner further admitted the "'174 patent does describe an EDCH message beginning at the start of a frame. So an EDCH message begins at the start of a frame. That's in our patent." [Oral Hearing at 35:16-18, Appx720]. Patent Owner also acknowledged, "A typical message – a EDCH message described in the '174 patent spans over 15 timeslots." [Oral Hearing at 37:18-20, Appx722].

Appellants contended "every message is going to start at a frame and a time slot boundary. So if -- if you do this at the beginning of the frame, that would be -- include being at the beginning of messages." [Oral Hearing at 11:13-16, Appx696]. When questioned by the Board as

to whether the "message" term needed an express construction, counsel for Appellants stated that no express construction was necessary as the patent indicated a "message" is "data that's being transmitted by the device, and that's the only instance in which it's certainly described in the '174 patent." [Oral Hearing at 13:8-14, Appx698]. Specifically, in response to the Patent Owner's proposed constructions for "message," Appellants rebutted "the patent is about how to transmit information from the subscriber station to the base station and how you can adjust the power in order to do that. And in these systems, that is always done at the beginning of a frame." [Oral Hearing at 62:16-20, Appx747].

The Board issued a Final Written Decision on January 6, 2016, finding that Appellants had not proven any of the claims were unpatentable by a preponderance of the evidence. [Final at 22, Appx22]. The Board construed the phrase "at a start of a message transmission using a first one of the codes" to modify the phrase "a total transmit power of the subscriber station for the codes." [Final at 10, Appx10]. The Board did not expressly construe any other term.

The Board found that Baker did not anticipate the Challenged Claims of the '174 Patent because it did not disclose the "*start of a*

*message transmission*." [Final at 12, Appx12]. In so doing, the Board effectively construed the term "message" according to its data content. As such, it found that Baker, which discloses calculating power headroom at a frame boundary in a UMTS system, did not disclose the "start of a message transmission" within the meaning of the '174 Patent because a "message" could last longer than a single frame. [Final at 13, Appx13]. Thus, according to the Board, "the start of a frame in Baker does not necessarily correspond to the start of a message transmission." [Final at 13, Appx13].

The Board further found that Appellants had not proven the Challenged Claims were obvious over a combination of Reed and Baker by a preponderance of the evidence. In particular, the Board held that Reed did not disclose the use of a single power headroom for a mobile device. Despite acknowledging Reed teaches a mobile device that could transmit multiple data streams and deliberately increase the headroom on one of the data streams to de-prioritize that data stream to benefit another, the Board held Reed teaches away from using a single power headroom for the mobile station. [Final at 14-19, Appx14-19]. The Board summarily dismissed Appellants obviousness challenge

predicated on a combination of Reed and Love for the same reason without specifically analyzing Love. [Final at 19, Appx19].

Additionally, the Board stated Petitioner's arguments regarding construction of the "message" claim term were "improper because it was presented for the first time at the oral hearing." [Final at 12 n.4, Appx12]. But as the hearing transcript makes clear, neither party had previously requested an express construction of the term "message." As such, this dispute arose for the first time at the hearing. The Board is therefore mistaken that this was an "improper" argument, as it was Patent Owner – not Petitioner – that first offered a construction of this term at the hearing.

A timely notice of appeal followed the Board's Final Written Decision. *See* [Notice of Appeal, Dkt. No. 1-2].

## SUMMARY OF THE ARGUMENT

The Board's Final Written Decision cannot stand, and should be vacated. First, the Board applied an unreasonable construction of the term "message" to the Challenged Claims that is neither correct nor allows for a workable application in an invalidity analysis. The term "message," in the context of the '174 Patent need not require a definite

endpoint, as the claims are broad enough to encompass an understanding of "message transmission" as transmissions of data at intervals specified in a UMTS system. As the Board's decision under 35 U.S.C. § 102(a) rests entirely on its understanding of "message," its ruling should be vacated.

Second, even under the Board's erroneous construction of "message," Baker anticipates the Challenged Claims of the '174 Patent. The preferred embodiment of the '174 Patent indicates the relevant "message" for determining when a power transmit difference should be determined lasts one frame and is, hence, transmitted at frame boundaries in a UMTS system. Baker clearly teaches transmitting data at frame boundaries. Thus, Baker discloses "start of a message transmission" limitation and anticipates the Challenged Claims of the '174 Patent.

Third, the Board erred by finding that Reed teaches away from the concept of determining a single power headroom in a system where the mobile device transmits using a plurality of codes. Each of the portions of Reed cited by Patent Owner and Board in support of this assertion clearly discloses modifying the headroom of the separate data

streams based on the mobile device's available transmit power in the aggregate. Thus, the Board's decision that Reed teaches the use of separate unrelated headrooms for the various data streams is not supported by substantial evidence. As this formed the only basis for its rulings regarding 35 U.S.C. § 103, its decision should be reversed.

## STANDARD OF REVIEW

"The ultimate construction of the claim is a legal question and, therefore, is reviewed de novo," *Info-Hold, Inc. v. Applied Media Techs. Corp.*, 783 F.3d 1262, 1265 (Fed. Cir. 2015), although "underlying factual determinations involving extrinsic evidence [are] reviewed for substantial evidence." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S.Ct. 831, 841-42 (2015). "Anticipation under 35 U.S.C. § 102 is a question of fact, while obviousness under § 103 is a question of law based on underlying findings of fact." *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015). The Court "review[s] the Board's factual findings for substantial evidence." *Id.* "Substantial evidence is something less than the weight of the evidence but more than a mere scintilla of evidence." *In re Moutett*, 686 F.3d 1322, 1331 (Fed. Cir. 2012).

## ARGUMENT

### I. The Board Erred by Construing "Message" According to Its Content and Requiring an Unspecified Beginning and Endpoint

The Board failed to properly construe the '174 Patent's claims, which in turn compromised its entire anticipation analysis. *See, e.g.*, *Regents of the Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 939-40 (Fed. Cir. 2013) ("Like an infringement analysis, an anticipation analysis has two parts: first, the disputed claim terms are construed, then the construed claims are compared to the prior art."). In an IPR, the Board must construe the claims of an unexpired patent according to their broadest reasonable interpretation (BRI) in light of the specification. 37 CFR § 42.100(b). This means that the claims "must be interpreted as broadly as their terms reasonably allow" in light of the specification. *In re Zletz,* 893 F.2d 319, 321 (Fed. Cir. 1989). "[A]mbiguities should be recognized, scope and breadth of language explored, and clarification imposed." *Id.*

The BRI standard cannot result in a narrower construction than the standard employed by district courts "when judging a patent's validity (*i.e.*, . . . giv[ing] those claims their 'ordinary meaning . . . as understood by a person of skill in the art.[)].'" *See Cuozzo Speed Techs.,*

*LLC v. Lee*, 136 S. Ct. 2131, 2139, 2145 (2016) ("Because an examiner's (or reexaminer's) use of the broadest reasonable construction standard increases the possibility that the examiner will find the claim too broad (and deny it), use of that standard encourages the applicant to draft narrowly") (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005)); *see also Facebook, Inc. v. Pragmatus AV, LLC*, 582 Fed. Appx. 864 (Fed. Cir. 2014) ("The broadest reasonable interpretation of a claim term may be the same as or broader than the construction of a term under the *Phillips* standard. But it cannot be narrower."). An issue of claim construction is presented for review even if the Board imposes additional limitations on a claim element without specifically articulating a rationale or indicating it is engaging in claim construction. *See Respironics, Inc. v. Zoll Med. Corp.*, No. 2015-1485, 2016 WL 4056094, at *3 (Fed. Cir. July 29, 2016) ("Our analysis of this issue includes two components: first, we determine whether the Board added a limitation when it applied the construction; second, we determine whether that limitation is appropriate under claim-construction law.").

The ‘174 Patent’s method is directed for use in a slotted multiple access radio communication system. *See* [‘174 Patent at 1:14-58, Appx30]. This means transmissions from the mobile station (“phone”) to the radio base station can only begin at certain intervals set by the base station, defined by the ‘174 Patent as “Transmission Time Intervals (“TTI”). [‘174 Patent at 4:65-67, Appx31]. The only disclosed embodiment discusses the claimed method in the context of a UMTS using CDMA coded channels, as depicted in Figure 1:




*See* [‘174 Patent at 1:14-58; Fig. 1]. Here, the Board erred by construing “message” in the Challenged Claims according to its own undefined notion of the content of a message. Even assuming a “message” can be defined by its content, the Board further erred by imposing an unduly

narrow restriction that excludes an understanding of "message transmission" as transmissions of data at intervals specified in a UMTS system.

### A. The '174 Patent's Claims Discuss "Message" in the Context of "*the Start of a Message Transmission*"

Claim construction "must begin with the words of the claims themselves." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 457 F.3d 1293, 1301 (Fed. Cir. 2006). Nothing in the claim language supports the Board's erroneous construction of "message." Claim 1 consists of the following limitations:

> determining a transmit power difference
>
> which is to be maintained by the subscriber station between on one hand a total maximum transmit power of the subscriber station for the codes and on another hand a total transmit power of the subscriber station for the codes at a start of a message transmission using a first one of the codes

['174 Patent, cl. 1].

At no point does Claim 1 discuss the length of a "message" or its content. In fact, the only temporal element specifically referenced in the claim is "*the start of a message*," which is further modified by "transmission." Nothing in the claim language signifies that a "message" must contain a threshold amount of data or comprise "a

continuous set of data that has a beginning and an end"[1]– a construction Patent Owner raised for the first time at the hearing. Nor does the claim language specify the duration of a "message" or provide further context for what the patentee intended by the use of this term. There is therefore no basis in the claims for defining "message" according to its duration or arrangement of data.

### B. Nothing in the Specification Supports the Board's Construction of "Message"

Nothing in the '174 Patent's written description supports the Board's construction of "message," and indeed, the specification directly contradicts the Board's ruling. The Board's construction of "message" is unreasonable in light of clear language in the specification, as it would read the preferred embodiment out of the scope of the claims. "[A] construction which excludes the preferred embodiment is 'rarely, if ever correct.'" *PPC Broadband, Inc. v. Corning Optical Communications RF, LLC*, 815 F.3d 747, 755 (Fed. Cir. 2016) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996)). Further, "[a] construction which reads the preferred embodiment out of the scope of

[1] [Oral Hearing at 32:2-5, Appx717].

the claims would generally seem at odds with the intention of the patentee as expressed in the specification," and thus cannot be the broadest reasonable interpretation of the claims. *Id.* (citing *Funai Elec. Co. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1371 (Fed. Cir. 2010)).

Here, as the Patent Owner freely acknowledged during the hearing, "a message . . . [i]n the '174 patent, it's described as an EDCH message, a particular type of message under the UMTS protocols." [Oral Hearing at 31:16-19, Appx716]. Patent Owner further admitted the "'174 patent does describe an EDCH message beginning at the start of a frame. So an EDCH message begins at the start of a frame. That's in our patent." [Oral Hearing at 35:16-18, Appx720]. Patent Owner also allowed, "A typical message – a EDCH message described in the '174 patent spans over 15 timeslots." [Oral Hearing at 37:18-20, Appx722].

Moreover, the concept of a "message" is discussed throughout the patent in terms of Transmission Time Intervals, type of data or the data rate necessary to transmit:

- "messages containing, for example, voice information, image information, video information, SMS (Short Message Service),

MMS (Multimedia Messaging Service) or other data" ['174 Patent at 1:18-21, Appx30].

- "The method described below can be applied in relation to any such start time, i.e. to any message transmission using the first code, or to a subset of the start times." ['174 Patent at 3:8-11, Appx31].
- "In the uplink (UL) direction the ***communication, i.e. the message transmission*** from the subscriber station UE to the base station NODE B." ['174 Patent at 4:30-32, Appx31] (emphasis added).

Indeed, the '174 Patent expressly contemplates sending messages as continuous transmissions and thus does not restrict the concept of "message" to discrete data groups having a beginning and an end. *See* ['174 Patent at 3:5-8, Appx31] ("If messages are transmitted using the first code at specific time intervals ***rather than continuously***, the start of a time interval of this kind corresponds to the start of the message transmission using the first code.") (emphasis added).

Further, the patent acknowledges that EDCH message transmissions may form parts of a service used by the subscriber

station. *See, e.g.*, [‘174 Patent at 7:54-8:7, Appx33]. For instance, the patent teaches varying the transmit power difference based on the particular type of service used by the subscriber unit:

> [T]here are services in which a minimum service rate is guaranteed . . . such as, for example, videotelephony and online gaming. A high transmit power difference should be specified for these services so that even if the radio channel deteriorates during the transmission of an EDCH message this can be made up for by an increase in the transmit power and the EDCH message can be transmitted without having to be aborted. Secondly there are services in which a high data rate is required, while an occasional breakdown in the transmission of an EDCH message does not have an overly negative impact. The aborted EDCH messages can be transmitted in full at a later time. Examples of this are non-realtime games.

[‘174 Patent at 7:57-8:4, Appx33]. Against the backdrop of the patent’s unequivocal definition of an EDCH message being 10 ms in length – a single UMTS frame – the ‘174 Patent’s concept of message cannot be limited to Patent Owner’s arguments and the Board’s apparent interpretation – that it must be a “logical group of data . . . an e-mail message, a text message. . . some related data that has a beginning and has an end.” [Oral Hearing at 38:20-39:10, Appx722]; *see also PPC Broadband*, 815 F.3d at 755 (“[A] construction which excludes the preferred embodiment is ‘rarely, if ever correct.’”).

The '174 Patent's claims and written description are thus broad enough to encompass an understanding of "message transmission" as transmissions of data at intervals specified in a UMTS system. The Board's interpretation of "message" requiring an unspecified beginning and endpoint runs contrary to the teachings in the claims and specification and consequently cannot be the broadest reasonable interpretation of the Challenged Claims.

### C. Baker Anticipates Under the Proper Understanding of "Message"

Armed with the correct understanding of "message" within the context of the '174 Patent, Baker clearly discloses the "*at a start of a message*" limitation in the Challenged Claims. Baker discloses this limitation by initiating a data message at a frame boundary:

> [A]t the ***boundary of the frame*** or time slot immediately preceding the sending of an ACK or NACK, these amplitudes are adjusted by for example reducing DPCCH whilst maintaining the power ratio PD/PC constant. Thus capacity is left for the transmission of the higher power one of ACK or NACK, even though the lower power one may be transmitted thereby making the combined transmit power lower than Pmax.

[Petition at 52 (quoting Baker [0030]), Appx303] (emphasis added).

This is illustrated clearly by Figure 4 in Baker:




FIG. 4

Absent the Board's erroneous interpretation of "message" requiring an unspecified beginning and endpoint, Baker clearly discloses the "start of a message transmission using a first one of the codes" step in the Challenged Claims. Indeed, the Board's holding that Baker does not disclose "messages" within the meaning of the '174 Patent was the only reason cited for this reference's alleged failure to anticipate the Challenged Claims. [Final at 12-13, Appx12-13]. The Board's ruling, which failed to correctly apply the broadest reasonable interpretation to the Challenged Claims should therefore be vacated and remanded to correctly construe "message" and apply a proper anticipation analysis.

## II. Baker Anticipates the '174 Patent Even under the Board's Erroneous Construction of "Message"

Even under the Board's unduly restrictive interpretation of the claims, Baker still discloses all Challenged Claims of the '174 Patent.

The Board's ruling regarding Baker solely rested on its holding that Baker does not disclose a "message" within the meaning of the '174 Patent. [Final at 12-14, Appx12-14]. But Baker does.

It is undisputed that the only disclosed embodiment of the '174 Patent indicates the "start of a message transmission using a first one of the codes" will always occur at a frame boundary in a UMTS system using CDMA. *See* [Oral Hearing at 35:16-18; 37:18-20, Appx720, Appx722] ("an EDCH message begins at the start of a frame. That's in our patent. . . A typical message – a EDCH message described in the '174 patent spans over 15 timeslots."); *see also* [Dinan Decl. at p. 11 ¶25, Appx2126] ("UMTS . . . uses time division techniques with a time-slot and frame structure to provide a channel structure. A physical channel is divided into 10 ms frames, each of which has fifteen time-slots each of 666 micro-seconds length."). And as Appellants have consistently argued in the Petition, the Reply, at the Hearing, and in this Brief, Baker teaches sending coded transmissions in a UMTS system using CDMA at "***a frame- or timeslot-boundary***." *See* [Baker [0004, 0030], Appx913-914].

These unequivocal admissions from the Patent Owner regarding the disclosure of "message" in the '174 Patent combined with the parties' experts' agreement on the frame and timeslot structure of data transmissions in a UMTS system clearly support a finding that Baker meets the "start of a message transmission using a first one of the codes" limitation. In the preferred embodiment, the "start of a message" will always occur at a frame boundary, which is precisely when Baker expressly teaches its method for reducing transmit power may occur. The Board's ruling is inconsistent with the weight of evidence that was before it.[2] It is therefore incorrect, unsupported by substantial evidence, and should be reversed.

---

[2] The Board alternatively characterized this as a matter of inherent anticipation. *See* [Final at 13, Appx13] ("[T]he mere possibility that the start of a frame may correspond to the start of a message transmission is not sufficient to show that Baker anticipates the challenged claims. *See In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999)"). As described above, however, it is not. Baker expressly discloses this limitation. Even assuming the "start of a message transmission using a first one of the codes" limitation is not explicitly disclosed, under an inherency analysis, Baker nonetheless anticipates. It is undisputed that in a UMTS system, the message transmissions at issue will always begin at a frame or timeslot boundary. Thus, Baker shows that the "start of a message transmission using a first one of the codes" limitation is "necessarily present" in its disclosure. *See Schering Corp. v. Geneva Pharmaceuticals*, 339 F.3d 1373, 1377

## III. The Board Erred in Finding Reed Does Not Render Obvious the Use of a Single Headroom for a Plurality of Codes

The Board's Final Written Decision found Reed did not disclose – and indeed – taught away from use of a single power headroom in a mobile device transmitting on multiple codes in a CDMA system. The Board's decision, however, ignores the clear teachings of Reed contemplating power headroom for the entire mobile device in de-prioritizing one data stream in favor of boosting the available transmit power of another. Thus, Reed in combination with Baker, or alternatively, with Love would render the purported invention in Breuer "obvious . . . to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103.

The Board's conclusion regarding Reed directly contradicts its disclosure. Reed teaches power control in wireless communications and discloses determining and maintaining power headroom for transmissions between a mobile station and a base station. *See* [Reed

---

(Fed. Cir. 2003) ("[A] prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference.").

Abstract, 2:20-28, Appx901, Appx905]. In Reed, "[h]eadroom is the difference between the ***maximum power of the transmitter*** and the transmission power level required for a particular data rate." [Reed 1:29-31, Appx905] (emphasis added). Reed further discloses use of two data streams corresponding to codes in a CDMA system and adjusting the headroom to allow one data stream to use a higher data transfer rate:

> If the mobile station desires to send ***two or more data streams*** (or hold voice and data connections at the same time), an ***addition[al] degree of freedom*** allows the mobile station to deliberately ***increase the headroom on one of the data streams*** to ***de-prioritize that data stream***. This would result in, for example, a longer time to transmit a text message from the mobile station but ***allow a digital picture to be transmitted at an optimum data rate***.

[Reed 4:14-21] (emphasis added). The Board acknowledged that the "heart of the matter" with respect to Reed is whether this paragraph teaches or suggests using a single headroom. [Oral Hearing at 53:7-13, Appx738].

The only plausible reading of Reed in light of this disclosure is that Reed modifies the headroom of the separate data streams based on the "***mobile station's available transmit power***" in the aggregate.

*See* [Reed 4:59-65, Appx906] ("after the base station receives the data transmission request . . . the base station obtains the ***mobile station's available transmit power*** . . . In step 360, the base station determines the data rate ***for the mobile station*** based on the headroom . . . and ***the mobile station's available transmit power***.") (emphasis added). Moreover, the Board's perceived inconsistency within Appellants' expert's testimony cannot displace the clarity of Reed's teaching that headroom in no uncertain terms refers to the "***mobile station's available transmit power***" in the aggregate. *See* [Reed 4:6-8; 59-65, Appx906] ("[T]he ***mobile station*** is capable of modifying ***its headroom*** under various predetermined conditions.") (emphasis added).

Patent Owner argued in response to the Petition that Reed teaches away from using a single headroom because it does not "disclose that the maximum power associated with two codes is often less than that associated with one code." [Patent Owner's Response at 36-37, Appx498-499]. But Patent Owner's argument is misplaced and irrelevant to the '174 Patent's written description and what its actual claims require. For instance, the '174 Patent defines headroom as the

difference of "between on the one hand the total maximum transmit power of the subscriber station for the plurality of codes and on the other hand the total transmit power of the subscriber station for the plurality of codes at the start of a message transmission using a first of the plurality of codes." ['174 Patent at 2:19-23, Appx30]. This express definition, of course, says nothing of the maximum transmit power being reached more often when using two codes. And notably, the *claims* make no mention of the tendency to reach a mobile station's maximum transmit power when transmitting two codes. In fact, the specification acknowledges this phenomenon is not universal: "If the subscriber station UE uses not just the code DCH, but the two codes EDCH and DCH in parallel, the situation in which the subscriber station UE reaches the maximum value of its transmit power ***occurs more often than*** if the subscriber station UE uses only the code DCH." ['174 Patent at 5:1-5, Appx32] (emphasis added). Further, Reed, like the '174 Patent, accounts for variations in maximum transmit power as evidenced by its written description's use of the word "***available*** transmit power." *See* [Reed 4:6-8; 59-65, Appx906] (emphasis added).

Thus, it is simply incorrect and unsupported by substantial evidence to conclude that Reed discloses anything other than determining power headroom based on available transmit power of the entire mobile device – and not calculating individual headrooms for separate data streams. For this reason, the Board's decision that the '174 Patent is not unpatentable as obvious over a combination of Reed and Baker and Reed and Love should be reversed.

## CONCLUSION

For the foregoing reasons, Appellants respectfully request that this Court vacate the Board's Final Written Decision and remand the case for the Board to properly construe the '174 Patent's claims under the broadest reasonable interpretation standard and to conduct a proper invalidity analysis.

August 15, 2016

Respectfully submitted,

/s/ *Steven A. Moore*
Steven A. Moore
Matthew R. Stephens
Pillsbury Winthrop Shaw Pittman LLP
501 W. Broadway, Suite 1100
San Diego, CA 92101
(619) 234-5000

*Counsel for HTC Corporation and ZTE (USA), Inc.*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned counsel certifies that this brief:

(i) complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 9,695 words, including footnotes and excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 2010 and is set in Century Schoolbook font in a size equivalent to 14 points or larger.

/s/ *Steven A. Moore*

August 18, 2016 Steven A. Moore

**CERTIFICATE OF SERVICE**

I hereby certify that on August 18, 2016, I served the foregoing Corrected Brief for Appellants on each party separately represented by CM-ECF.

/s/ *Steven A. Moore*

Dated: August 18, 2016

Steven A. Moore

# ADDENDUM

# TABLE OF CONTENTS


| DOCUMENT | PAGE |
|---|---|
| Final Written Decision re: ‘174 IPR2014-01134 | Appx1 |
| U.S. Patent No. 7,941,174 B2 | Appx28 |

Trials@uspto.gov
571–272–7822

Paper 57
Entered: January 6, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

AMAZON.COM, INC., HTC CORPORATION, ZTE (USA), INC.,
PANTECH CO., LTD., PANTECH WIRELESS, INC.,
LG ELECTRONICS, INC., LG ELECTRONICS U.S.A., INC., and
DELL INC.,
Petitioner,

v.

CELLULAR COMMUNICATIONS EQUIPMENT, LLC,
Patent Owner.

---

Case IPR2014-01134
Patent 7,941,174 B2

---

Before JENNIFER S. BISK, GREGG I. ANDERSON, and
ROBERT J. WEINSCHENK, *Administrative Patent Judges*.

WEINSCHENK, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

# I. INTRODUCTION

Amazon.com, Inc., NEC Corporation of America, NEC Mobile Communications, Ltd.,[1] HTC Corporation, ZTE (USA), Inc., Pantech Co., Ltd., Pantech Wireless, Inc., LG Electronics, Inc., LG Electronics U.S.A., Inc., and Dell Inc. (collectively, "Petitioner") filed a Petition (Paper 10, "Pet.") requesting an *inter partes* review of claims 1, 6, 9, 14, 18, and 19 of U.S. Patent No. 7,941,174 B2 (Ex. 1001, "the '174 patent"). Cellular Communications Equipment, LLC ("Patent Owner") filed a Preliminary Response (Paper 15, "Prelim. Resp.") to the Petition. On January 15, 2015, we instituted an *inter partes* review of claims 1, 6, 9, 14, 18, and 19 ("the challenged claims") of the '174 patent on the following grounds:

| **Claim(s)** | **Statutory Basis** | **Applied References(s)** |
|---|---|---|
| 1, 6, 9, 14, 18, and 19 | 35 U.S.C. § 102(e) | U.S. Patent Pub. No. 2008/0151840 A1 (published June 26, 2008) (Ex. 1005, "Baker") |
| 1, 6, 9, 14, 18, and 19 | 35 U.S.C. § 103(a) | U.S. Patent No. 7,689,239 B2 (issued Mar. 30, 2010) (Ex. 1004, "Reed") and Baker |
| 1, 6, 9, 14, 18, and 19 | 35 U.S.C. § 103(a) | Reed and U.S. Patent No. 7,321,780 B2 (issued Jan. 22, 2008) (Ex. 1006, "Love") |

Paper 16 ("Dec. on Inst."), 17.

After institution, Patent Owner filed a Response (Paper 33, "PO Resp.") to the Petition, and Petitioner filed a redacted Reply (Paper 42, "Pet. Reply") and a sealed Reply (Paper 43) to the Response. An oral hearing was

[1] NEC Mobile Communications, Ltd. was formerly known as NEC CASIO Mobile Communications, Ltd. Paper 14, 2. NEC Corporation of America and NEC Mobile Communications, Ltd. were dismissed on February 12, 2015. Paper 21, 2–3.

held on August 26, 2015, and a transcript of the hearing is included in the record. Paper 56 ("Tr.").

We issue this Final Written Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. For the reasons set forth below, Petitioner has not shown by a preponderance of the evidence that claims 1, 6, 9, 14, 18, and 19 of the ’174 patent are unpatentable.

A. *Related Proceedings*

The parties indicate that the ’174 patent is the subject of several cases in the United States District Court for the Eastern District of Texas. Pet. 1–2; Paper 13, 2–3.

B. *The ’174 Patent*

The ’174 patent relates to a radio communication system in which a subscriber station is assigned a plurality of codes for transmitting messages. Ex. 1001, col. 1, ll. 14–17. According to the ’174 patent, when radio transmission conditions deteriorate while a subscriber station is transmitting a message, a base station may request that the subscriber station increase the transmit power. *Id.* at col. 4, ll. 47–50. However, a subscriber station can only increase the transmit power up to a maximum value for that subscriber station. *Id.* at col. 4, ll. 50–52. As a result, if a subscriber station reaches the maximum transmit power during transmission of a message and subsequently receives a request from the base station to increase the transmit power, the subscriber station may have to abort transmission of the message before completion. *Id.* at col. 5, ll. 54–61.

To address this problem, the ’174 patent describes a system in which the subscriber station maintains a transmit power difference or "power headroom." *Id.* at col. 6, ll. 40–44. The transmit power difference is a

difference between the total transmit power for a plurality of codes assigned to the subscriber station at the start of a message transmission and the maximum transmit power for a plurality of codes assigned to the subscriber station. *Id.* at col. 6, ll. 42–47. For example, if the maximum transmit power for a subscriber station is 18 dBm and a transmit power difference of 8 dBm is maintained by the subscriber station, the subscriber station has 10 dBm of transmit power at the start of a message transmission. *Id.* at col. 6, l. 55–col. 7, l. 3. As a result, if the base station requests an increase in transmit power for one of the codes during transmission, the subscriber station has 8 dBm of headroom to increase the transmit power without having to abort the transmission. *Id.* at col. 6, ll. 40–49. The amount of the transmit power difference maintained by a subscriber station can be determined based on a variety of factors, including current interference, type of service, network strategy, and subscriber class. *Id.* at col. 7, ll. 29–30, col. 7, ll. 54–55, col. 8, ll. 8–9, col. 8, l. 13.

C. *Illustrative Claim*

Claims 1, 9, and 18 are independent. Claim 1 is reproduced below.

> 1. A method for operating a radio communication system in which a subscriber station is assigned a plurality of codes for transmitting messages, comprising:
>
> determining a transmit power difference which is to be maintained by the subscriber station between on one hand a total maximum transmit power of the subscriber station for the codes and on another hand a total transmit power of the subscriber station for the codes at a start of a message transmission using a first one of the codes.

*Id.* at col. 9, ll. 56–64.

## II. ANALYSIS

### A. *Identification of Real Parties in Interest*

The Petition identifies several real parties in interest. Pet. 1. Based on the information in the Petition and Preliminary Response, we did not identify any issues under 35 U.S.C. § 312(a)(2) or § 315(b), and we instituted an *inter partes* review. *See* Dec. on Inst. 2. Patent Owner argues in its Response that NEC Corporation and HTC America are real parties in interest that are not identified in the Petition. PO Resp. 41. According to Patent Owner, the Decision on Institution should be vacated because, under 35 U.S.C. § 312(a)(2), a petition that does not identify all the real parties in interest cannot be considered. PO Resp. 42–44. For the reasons discussed below, we do not vacate the Decision on Institution.

#### 1. *NEC Corporation*

The Petition identifies NEC Corporation of America ("NEC America") and NEC Mobile Communications, Ltd.[2] ("NEC Mobile") as real parties in interest. Pet. 1. Patent Owner argues that the Petition also should have identified NEC Corporation as a real party in interest because NEC Corporation controlled the participation of NEC America and NEC Mobile in this case. PO Resp. 47–49. Specifically, Patent Owner argues that NEC Corporation executed a Settlement Agreement with Patent Owner that required NEC America and NEC Mobile to withdraw from this case. *Id.* at 48. Patent Owner also argues that certain statements in the Motion to Terminate NEC America and NEC Mobile demonstrate that NEC

[2] NEC Mobile Communications, Ltd. was formerly known as NEC CASIO Mobile Communications, Ltd. Paper 14, 2.

Corporation controlled the participation of NEC America and NEC Mobile in this case. *Id.* at 47–48.

Patent Owner and NEC Corporation executed the Settlement Agreement that allegedly demonstrates NEC Corporation's control with respect to this case on November 17, 2014. *Id.* at 45. Because Patent Owner is a party to the Settlement Agreement, Patent Owner knew of its terms at that time. *Id.* Thus, Patent Owner could have raised the issue of whether NEC Corporation is a real party in interest when the Settlement Agreement was executed, but did not. Patent Owner, NEC America, and NEC Mobile filed the Motion to Terminate that allegedly demonstrates NEC Corporation's control with respect to this case on February 5, 2015. Paper 19. Because Patent Owner signed the Motion to Terminate, Patent Owner knew of the statements therein at that time. *Id.* at 7–8. Thus, Patent Owner also could have raised the issue of whether NEC Corporation is a real party in interest when the Motion to Terminate was filed, but did not.

Patent Owner instead waited until after we granted the Motion to Terminate and dismissed NEC America and NEC Mobile from this case to argue that NEC Corporation had controlled their participation. Ex. 2002, 19:18–25:18. The result of Patent Owner's delay is that the parties whose conduct is in question no longer are involved in this case. Patent Owner previously assured the remaining parties and the Board that "NEC's termination from the IPRs [would] have little, if any, impact on the remaining parties or the Board." Paper 19, 5. Yet, now, Patent Owner seeks the extraordinary remedy of terminating this case in its entirety based on statements made in the documents that secured the dismissal of NEC America and NEC Mobile (documents which the remaining parties did not

sign). Given Patent Owner's delay and previous assurances regarding the dismissal of NEC America and NEC Mobile, we decline to terminate this case with respect to the remaining parties. *See* 37 C.F.R. § 42.12.

2. *HTC America*

Patent Owner argues that HTC America should have been identified as a real party in interest in the Petition because of the relationship between HTC America and HTC Corporation. PO Resp. 51–58. Specifically, Patent Owner argues that: 1) HTC America is a wholly owned subsidiary of HTC Corporation (*id.* at 51); 2) HTC America and HTC Corporation often act jointly in other cases (*id.* at 51–52, 54); 3) HTC America and HTC Corporation share inside and outside counsel (*id.* at 52–53); 4) the power of attorney for HTC Corporation in IPR2014-01135 was signed on behalf of an HTC America employee (*id.* at 53); and 5) HTC America is identified as a real party in interest in most other petitions for *inter partes* review that identify HTC Corporation as a real party in interest (*id.* at 54–55). Patent Owner's argument is not persuasive.

Whether a party is a real party in interest is a "highly fact-dependent question" that is evaluated "on a case-by-case basis." Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,759–60 (Aug. 14, 2012). Some of the common considerations for determining whether a party is a real party in interest include whether the party funds, directs, or controls the petition or proceeding. *Id.* at 48,760. Here, Patent Owner does not identify any evidence indicating that HTC America funds, directs, controls, or otherwise is involved in *this* petition or proceeding. Patent Owner's argument that HTC America and HTC Corporation acted jointly in other cases and that HTC America is named as a real party in interest in other cases does not

indicate that HTC America is a real party in interest in this case. Similarly, Patent Owner's argument that an employee of HTC America is identified on the power of attorney for HTC Corporation in IPR2014-01135 does not indicate that HTC America is a real party in interest in this case.[3] Finally, Patent Owner's argument that HTC America and HTC Corporation share counsel does not indicate that HTC America funds, directs, controls, or otherwise is involved in this case.

B. *Claim Construction*

The claims of an unexpired patent are interpreted using the broadest reasonable interpretation in light of the specification of the patent in which they appear. 37 C.F.R. § 42.100(b); *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1278–79 (Fed. Cir. 2015). Claim terms generally are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the specification. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). An applicant may provide a different definition of the term in the specification with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). In the absence of such a definition, limitations are not to be read into the claims from the specification. *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993).

---

[3] We also are not persuaded by Patent Owner's argument because the power of attorney for HTC Corporation in IPR2014-01135 was signed by an employee of HTC Corporation (Pet. Reply 23–24; Ex. 2023, 24:20–25:6), and Petitioner represents that the reference to an HTC America employee was an oversight (Pet. Reply 24).

1. *at a start of a message transmission using a first one of the codes*

Petitioner argues that the phrase "at a start of a message transmission using a first one of the codes" does not require express construction. Pet. Reply 3. Patent Owner argues that we should clarify that the phrase "at a start of a message transmission using a first one of the codes" modifies the phrase "a total transmit power of the subscriber station for the codes" in the challenged claims. PO Resp. 15–17. We determine that Patent Owner's proposed interpretation is the broadest reasonable interpretation.

Patent Owner's proposed interpretation is supported by the claim language and the specification. In the challenged claims, the disputed phrase "at a start of a message transmission using a first one of the codes" immediately follows the phrase "a total transmit power of the subscriber station for the codes." Ex. 1001, col. 9, ll. 62–64, col. 10, ll. 38–40, col. 12, ll. 8–10. Further, the specification explains that a "transmit power difference" is a difference between "a first and a second transmit power." *Id.* at col. 2, ll. 41–43. According to the specification, the first transmit power is "the total maximum transmit power of the subscriber station for the plurality of codes" (*id.* at col. 2, ll. 45–47), and "[t]he second of the two transmit powers is the total transmit power of the subscriber station for the plurality of codes *at the start of a message transmission using a first of the codes*" (*id.* at col. 2, ll. 59–61 (emphasis added)). Thus, the specification indicates that the phrase "at a start of a message transmission using a first one of the codes" modifies the total transmit power. Other portions of the specification also support Patent Owner's interpretation. *See, e.g., id.* at col. 6, ll. 42–47 ("The transmit power difference . . . is required to exist between *the total transmit power for the two codes DCH and EDCH at the start of*

*the transmission of an EDCH message* and the maximum transmit power for the two codes DCH and EDCH." (emphasis added)), col. 8, ll. 51–63.

Therefore, we determine that, when given the broadest reasonable interpretation, the phrase "at a start of a message transmission using a first one of the codes" in the challenged claims modifies the phrase "a total transmit power of the subscriber station for the codes."

C. *Anticipation of Claims 1, 6, 9, 14, 18, and 19 by Baker*

Petitioner argues that claims 1, 6, 9, 14, 18, and 19 are anticipated by Baker. Pet. 20. A claim is anticipated if each limitation of the claim is disclosed in a single prior art reference arranged as in the claim. *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008). We have considered the parties' arguments and supporting evidence, and we determine that Petitioner has not shown by a preponderance of the evidence that claims 1, 6, 9, 14, 18, and 19 are anticipated by Baker.

Independent claim 1 recites "determining a transmit power difference which is to be maintained by the subscriber station between on one hand a total maximum transmit power of the subscriber station for the codes and on another hand a total transmit power of the subscriber station for the codes *at a start of a message transmission* using a first one of the codes." Ex. 1001, col. 9, ll. 56–64 (emphasis added). Independent claims 9 and 18 recite similar limitations, with independent claim 18 further reciting at least one processor that is programmed to determine the transmit power difference. *Id.* at col. 10, ll. 32–40, col. 12, ll. 1–10.

Petitioner argues that Baker discloses a mobile station that transmits signals on two channels, DPDCH and DPCCH. Pet. 21; Ex. 1005 ¶ 23. The mobile station also transmits a positive ("ACK") or negative ("NACK")

acknowledgement using a third channel, HS-DPCCH. Pet. 21; Ex. 1005 ¶¶ 24–25. The transmit power for the signals on the DPDCH and DPCCH channels is reduced at the boundary of the frame or timeslot immediately preceding the ACK or NACK signal to ensure that there is enough transmit power available for the ACK or NACK signal. Pet. 22; Ex. 1005 ¶¶ 27, 30. Petitioner argues that the mobile station in Baker determines a transmit power difference, as recited in the challenged claims, by determining how much to reduce the transmit power for the DPDCH and DPCCH channels at the boundary of the frame or timeslot immediately preceding the ACK or NACK signal. Pet. 22–23. Figure 4 of Baker, as annotated by Petitioner, is reproduced below.




FIG. 4

*Id.* at 26. Figure 4 of Baker is a timing diagram showing the signals sent by the mobile station. Ex. 1005 ¶ 15. According to Petitioner, the transmit power difference is the difference between $P_{max}$ and the total transmit power for $P_{C2}$ and $P_{D2}$ at the boundary of the frame or timeslot immediately preceding the ACK or NACK signal. Pet. 23–26.

Patent Owner argues that Petitioner has not shown sufficiently that the boundary of the frame or timeslot immediately preceding the ACK or NACK signal in Baker is the start of a message transmission. PO Resp. 35–36. Specifically, Patent Owner identifies evidence indicating that a message

transmission may include multiple frames and timeslots. *Id.*; Ex. 1015 ¶ 11; Ex. 2022 ¶ 87. Thus, according to Patent Owner, the boundary of the frame or timeslot immediately preceding the ACK or NACK signal in Baker is not necessarily the start of a message transmission. PO Resp. 35–36; Ex. 2022 ¶¶ 85–87. We agree with Patent Owner.

Petitioner does not identify any express disclosure in Baker indicating that the boundary of the frame or timeslot immediately preceding the ACK or NACK signal is the start of a message transmission. Pet. 23–26; Pet. Reply 9–10; Tr. 11:3–10. Petitioner instead argues that "an EDCH message as described in the '174 patent can be a single frame," and, thus, "maintaining a transmit power difference at a start of a *frame* (i.e., at a start of an EDCH message transmission) must be equivalent to maintaining a transmit power difference at a start of a *message*." Pet. Reply 9; Tr. 13:15–19. In other words, Petitioner argues that the start of a frame of an EDCH message inherently is the start of a message transmission.[4]

Petitioner's argument is not persuasive. First, Petitioner only argues that the mobile station in the '174 patent transmits an EDCH message. Pet. Reply 9. Petitioner does not argue or identify evidence indicating that the mobile station in Baker transmits an EDCH message. *Id.* at 9–10; Tr. 12:6–

---

[4] Petitioner argued at the oral hearing that the term "message transmission" in the challenged claims refers to any frame in a message because the EDCH message described in the '174 patent can be a single frame. Tr. 61:2–62:10. Petitioner's argument is improper because it was presented for the first time at the oral hearing. *See* Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,768 (Aug. 14, 2012). Further, we are not persuaded that, because an EDCH message sometimes can be a single frame, the phrase "at a start of a message transmission" refers to the start of *any* frame in a message transmission.

16. Therefore, Petitioner's argument that the start of a frame of an EDCH message inherently is the start of a message transmission does not demonstrate that the start of a frame in Baker inherently is the start of a message transmission. Tr. 12:6–16. Second, Petitioner does not identify evidence indicating that the start of a frame of an EDCH message necessarily is the start of a message transmission. Pet. Reply 9–10. Petitioner argues that an EDCH message *can* be a single frame, and, thus, the start of a frame of an EDCH message *can* be the start of a message transmission. *Id.* at 9; Ex. 1015 ¶ 11. However, the mere possibility that the start of a frame may correspond to the start of a message transmission is not sufficient to show that Baker anticipates the challenged claims. *See In re Robertson,* 169 F.3d 743, 745 (Fed. Cir. 1999) ("Inherency . . . may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient."). Further, Petitioner acknowledges that a message transmission in Baker may include more than one frame, and, as a result, the start of a frame in Baker does not necessarily correspond to the start of a message transmission. Tr. 12:6–16, 16:19–19:13.

Therefore, because Petitioner has not shown that Baker expressly or inherently discloses determining a transmit power difference between a maximum transmit power for the codes and a total transmit power for the codes *at a start of a message transmission* using a first one of the codes, Petitioner has not shown by a preponderance of the evidence that Baker anticipates claims 1, 6, 9, 14, 18, and 19.

D. *Obviousness of Claims 1, 6, 9, 14, 18, and 19*

Petitioner argues that claims 1, 6, 9, 14, 18, and 19 would have been obvious over Reed and Baker and over Reed and Love. Pet. 27, 36. A claim is unpatentable as obvious under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains. *KSR Int'l Co. v. Teleflex Inc*., 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) any objective indicia of non-obviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). We have considered the parties' arguments and supporting evidence, and we determine that Petitioner has not shown by a preponderance of the evidence that claims 1, 6, 9, 14, 18, and 19 would have been obvious over Reed and Baker or over Reed and Love.

1. *Reed and Baker*

Petitioner argues that Reed teaches a mobile station that determines its maximum transmission power, subtracts a headroom, and uses the remaining available transmit power to determine a maximum data rate for the data in its buffer. Pet. 32; Ex. 1004, col. 1, ll. 32–36. Petitioner argues that the headroom in Reed corresponds to the transmit power difference recited in the challenged claims. Pet. 30–32.

Petitioner acknowledges that Reed does not teach expressly that the mobile station is assigned *a plurality of codes* for transmitting messages,

and, thus, also does not teach expressly a transmit power difference between a maximum transmit power *for the codes* and a total transmit power *for the codes,* as recited in the challenged claims. *Id.* at 28–29, 32–33; Ex. 1001, col. 9, ll. 56–64, col. 10, ll. 32–40, col. 12, ll. 1–10. Petitioner argues that:

> [A]lthough Reed does not explicitly disclose that a mobile station can be assigned a plurality of codes, Reed discloses that the mobile station can transmit two or more data streams or signals at the same time. Reed also discloses that the described communication system is a CDMA (Code Division Multiple Access) system in which signals are transmitted using codes.
>
> Baker explicitly discloses that "[a]s is customary with spread spectrum signaling several signals can be transmitted simultaneously each signal having its own signature or spreading code selected from a set of signatures." Thus, Baker discloses that the plurality of data streams mentioned in Reed can each have its own code. Indeed, as described above, Baker discloses *a subscriber station is assigned a plurality of codes*. It would have been obvious to one skilled in the art to understand that the two or more data streams transmitted by the mobile station in Reed can be transmitted on different channels using different codes.

*Id.* at 29 (internal citations omitted). In other words, Petitioner argues that Reed teaches a mobile station that can transmit two or more data streams, and it would have been obvious to one of ordinary skill in the art based on Baker that each data stream in Reed could be assigned a different code. *Id.*

Patent Owner argues that, even assuming each data stream in Reed is assigned a different code, Petitioner still has not shown sufficiently that the challenged claims would have been obvious over Reed and Baker. PO Resp. 39–41. The challenged claims recite determining a single transmit power difference for a plurality of codes assigned to the subscriber station. *Id.* at 39; Ex. 1001, col. 9, ll. 56–64, col. 10, ll. 32–40, col. 12, ll. 1–10. Patent

Owner argues that, in contrast, Reed teaches determining a separate headroom for each data stream (and thus each code), not a single headroom for a plurality of codes. PO Resp. 39–41. We agree with Patent Owner that Petitioner has not shown by a preponderance of the evidence that the challenged claims would have been obvious over Reed and Baker.

As discussed above, Petitioner argues that Reed teaches a mobile station that can transmit two or more data streams. Pet. 28–29 (citing Ex. 1004, col. 4, ll. 14–21). The portion of Reed cited by Petitioner states that:

> *If the mobile station desires to send two or more data streams* (or hold voice and data connections at the same time), an addition [sic] degree of freedom *allows the mobile station to deliberately increase the headroom on one of the data streams to de-prioritize that data stream*. This would result in, for example, a longer time to transmit a text message from the mobile station but allow a digital picture to be transmitted at an optimum data rate.

Ex. 1004, col. 4, ll. 14–21 (emphases added). This portion of Reed indicates that the headroom for one data stream can be adjusted independently of the headroom for the other data streams, and, thus, demonstrates that each data stream has its own headroom. *Id.*; Ex. 1003 ¶ 110; Ex. 2022 ¶¶ 100–101. As a result, assuming that each data stream in Reed is assigned a different code, Reed teaches determining a separate headroom for each code, not determining a single headroom for a plurality of codes. Ex. 1003 ¶ 110; Ex. 2022 ¶¶ 101–104.

Petitioner argues that Patent Owner's interpretation of Reed is incorrect. Pet. Reply 12–14. Specifically, Petitioner argues that:

> The disclosure in Reed that Patent Owner refers to describes that one data stream can be de-prioritized for the benefit of another data stream (for example, the system can de-prioritize a text message transmission in order to reserve transmission

> power for more data intensive transmissions such as digital pictures). (*See* Williams Decl. ¶¶ 13–14.) This provides "an addition[al] degree of freedom" because more power can be allocated to higher-priority transmissions by reducing power allocated to lower- priority transmissions. (*See* Williams Decl. ¶¶ 13–14.) If Reed disclosed *independently* establishing headroom for each code, as Patent Owner contends, there would be no "degree of freedom" for this prioritization of transmissions because the reserved power on one stream could not be used for transmission on any other stream. (*See* Williams Decl. ¶¶ 13–14.)

Pet. Reply 13. Petitioner's argument is not persuasive. Petitioner's argument cites exclusively to the second declaration of Dr. Tim Williams. *Id.* In his first declaration, Dr. Williams states that "[o]ne skilled in the art would understand that the data streams disclosed in Reed are assigned different codes, each code having its own headroom." Ex. 1003 ¶ 110. Thus, Dr. Williams' first declaration supports Patent Owner's argument. In his second declaration, Dr. Williams takes the opposite position and states that one of ordinary skill in the art would understand that Reed teaches determining a single headroom for more than one code. Ex. 1015 ¶¶ 13–14. Because the statements in Dr. Williams' second declaration cited by Petitioner are inconsistent with Dr. Williams' first declaration, we determine that those statements lack credibility and we afford them little weight.

Further, even if we afforded significant weight to the cited statements in Dr. Williams' second declaration, Petitioner's argument still is not persuasive. Petitioner argues that Reed teaches that one data stream can be deprioritized relative to another data stream. Pet. Reply 13. Petitioner argues that, to deprioritize a data stream, power must be reallocated from one data stream to another data stream, which allegedly cannot be

accomplished if each data stream has its own headroom.[5] *Id.* However, Petitioner does not identify any portion of Reed that mentions reallocating power between data streams. *Id.* Rather, Reed teaches that, if the headroom for one data stream is increased, then the maximum data rate for that data stream is decreased. Ex. 1004, col. 2, ll. 13–19. Reed explains that, as a result, a particular data stream can be deprioritized by increasing the headroom for that data stream until its data rate is less than the data rate of the other data streams. *Id.* at col. 4, ll. 11–21. Thus, contrary to Petitioner's argument, Reed teaches that a data stream can be deprioritized relative to other data streams, even when each data stream has its own headroom. Ex. 2022 ¶ 101.

Petitioner also argues that Reed teaches determining "headroom for the *entire* device, rather than just for an individual code the mobile station may be transmitting." Pet. Reply 13–14 (citing Ex. 1004, col. 2, l. 56–col. 4, l. 13, Fig. 2). Petitioner's argument is not persuasive. The portions of Reed cited by Petitioner refer to a first preferred embodiment that describes transmitting one data stream. Ex. 1004, col. 2, ll. 22–25, col. 2, ll. 56–57. In that embodiment, where the mobile station only transmits one data stream, the headroom for that data stream would correspond to the headroom for the entire device. However, the portions of Reed cited by Petitioner do not demonstrate that there is a single headroom for the entire device when the mobile station transmits two or more data streams. Also, Petitioner does not argue or identify evidence indicating that it would have been obvious to a

[5] Petitioner acknowledged at the oral hearing that this argument is premised on an assumption that the headroom in Reed is fixed. Tr. 25:1–27:12. That assumption is inconsistent with the express teaching in Reed that the headroom can be increased. Ex. 1004, col. 4, ll. 9–21.

person of ordinary skill in the art to modify Reed to use a single headroom when the mobile station transmits two or more data streams.

Because Petitioner has not shown that it would have been obvious based on Reed and Baker to determine a transmit power difference between a maximum transmit power *for a plurality of codes* and a total transmit power *for a plurality codes* at a start of a message transmission, Petitioner has not shown by a preponderance of the evidence that claims 1, 6, 9, 14, 18, and 19 would have been obvious over Reed and Baker.

2. *Reed and Love*

Petitioner relies on the same teachings in Reed discussed above (Pet. 36–42), but relies on Love instead of Baker to compensate for the identified deficiencies in Reed (*id.* at 37–38). Specifically, Petitioner argues that Reed teaches a mobile station that can transmit two or more data streams, and it would have been obvious to one of ordinary skill in the art based on Love that each data stream in Reed could be assigned a different code. *Id.* For the same reasons discussed above with respect to the combination of Reed and Baker, Petitioner has not shown that it would have been obvious based on Reed and Love to determine a transmit power difference between a maximum transmit power *for a plurality of codes* and a total transmit power *for a plurality codes* at a start of a message transmission. *See supra* Section II.D.1; PO Resp. 41; Pet. Reply 15. Therefore, Petitioner has not shown by a preponderance of the evidence that claims 1, 6, 9, 14, 18, and 19 would have been obvious over Reed and Love.

E. *Petitioner's Motion to Exclude*

Petitioner filed a Motion to Exclude Exhibits 2003, 2005–2019, and 2021 (Paper 48), to which Patent Owner filed an Opposition (Paper 51), and

Petitioner filed a Reply (Paper 54). Petitioner's Motion to Exclude Exhibits 2003, 2005–2019, and 2021 is *dismissed as moot* because this Decision does not rely on Exhibits 2003, 2005–2019, and 2021.

F. *Patent Owner's Motion to Exclude*

Patent Owner filed a Motion to Exclude (Paper 46, "PO Mot."), to which Petitioner filed an Opposition (Paper 50), and Patent Owner filed a Reply (Paper 53). Patent Owner argues that Exhibit 1017 and paragraphs 15 and 16 of Exhibit 1015 should be excluded under Fed. R. Evid. 802, Fed. R. Evid. 901, 37 C.F.R. §§ 42.22, 42.23, 42.104, and 35 U.S.C. § 312. PO Mot. 2. Patent Owner also argues that Petitioner's reliance on Exhibit 1017 and paragraphs 15 and 16 of Exhibit 1015 "present[s] a number of rule violations." PO Mot. 3. Patent Owner points out that "Exhibit 1017 was not included in the petition or part of any instituted ground of unpatentability," but does not explain specifically why Exhibit 1017 and paragraphs 15 and 16 of Exhibit 1015 should be excluded under any of the cited rules. PO Mot. 2–3. Therefore, we are not persuaded that Exhibit 1017 and paragraphs 15 and 16 of Exhibit 1015 should be excluded, and Patent Owner's Motion to Exclude is *denied*. Patent Owner's Motion to Exclude also is moot because this Decision does not rely on Exhibit 1017 or paragraphs 15 and 16 of Exhibit 1015.

G. *Petitioner's Motion to Seal*

Petitioner filed a Motion to Seal. Paper 41 ("Mot."). Petitioner requests entry of a protective order and seeks to seal portions of Petitioner's Reply. *Id.* at 1, 4. For the reasons discussed below, the Motion to Seal is *granted*.

The parties agree to the default protective order found in Appendix B of the Office Patent Trial Practice Guide with one modification. *Id.* at 3. Specifically, the parties limit the individuals who can access confidential information to outside counsel for the parties, the Office, and their support personnel. *Id.* We hereby enter the Protective Order filed as Exhibit 1018 in this proceeding, which governs the treatment and filing of confidential information in this proceeding.

There is a strong public policy that favors making information filed in an *inter partes* review open to the public. *Garmin Int'l, Inc. v. Cuozzo Speed Techs. LLC*, IPR2012-00001, Paper 34, 1–2 (PTAB Mar. 14, 2013). The standard for granting a motion to seal is good cause. 37 C.F.R. § 42.54. That standard includes showing that the information addressed in the motion to seal is truly confidential, and that such confidentiality outweighs the strong public interest in having the record open to the public. *See Garmin* IPR2012-00001, Paper 34, 2–3. The portions of the Reply that Petitioner seeks to seal relate to the terms of the confidential Settlement Agreement between Patent Owner and NEC Corporation. Mot. 2–3. We have reviewed the Motion to Seal, the document sought to be sealed, and the redacted, public version of that document, and we determine that good cause exists to grant Petitioner's Motion to Seal.

## III. CONCLUSION

Petitioner has not shown by a preponderance of the evidence that claims 1, 6, 9, 14, 18, and 19 of the '174 patent are unpatentable under 35 U.S.C. §§ 102(e), 103(a).

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1, 6, 9, 14, 18, and 19 of the ’174 patent are not shown unpatentable;

FURTHER ORDERED that Petitioner’s Motion to Exclude is *dismissed as moot*;

FURTHER ORDERED that Patent Owner’s Motion to Exclude is *denied*;

FURTHER ORDERED that Petitioner’s Motion to Seal is *granted*;

FURTHER ORDERED that the Protective Order filed as Exhibit 1018 is entered in this proceeding;

FURTHER ORDERED that the identified portions of Petitioner’s Reply (Paper 43) will be sealed; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

PETITIONER:

J. David Hadden
Saina S. Shamilov
FENWICK & WEST LLP
dhadden@fenwick.com
sshamilov@fenwick.com

Steven A. Moore
Richard W. Thill
PILLSBURY WINTHROP SHAW PITTMAN LLP
steve.moore@pillsburylaw.com
richard.thill@pillsburylaw.com
LOEU@pillsburylaw.com

Alan A. Wright
Steven B. Kelber
H.C. PARK & ASSOCIATES, PLC
awright@park-law.com
skelber@park-law.com

Roger J. Fulghum
Tammy M. Pennington
BAKER BOTTS
roger.fulghum@bakerbotts.com
tammy.pennington@bakerbotts.com

Baldine Paul
William J. Barrow
Robert G. Pluta
Amanda K. Streff
MAYER BROWN LLP
bpaul@mayerbrown.com
wbarrow@mayerbrown.com
rpluta@mayerbrown.com
astreff@mayerbrown.com

PATENT OWNER:

Barry J. Bumgardner
John Murphy
NELSON BUMGARDNER, P.C.
barry@nelbum.com
CCE-IPR@nelbum.com

Amedeo F. Ferraro
MARTIN & FERRARO, LLP
aferraro@martinferraro.com

US007941174B2

(12) **United States Patent**
**Breuer et al.**

(10) **Patent No.: US 7,941,174 B2**
(45) **Date of Patent: May 10, 2011**

(54) **METHOD FOR MULTICODE TRANSMISSION BY A SUBSCRIBER STATION**

(75) Inventors: **Volker Breuer**, Bötzow (DE); **Thomas Ulrich**, Bad Dürkheim (DE)

(73) Assignee: **Nokia Siemens Networks GmbH & Co. KG**, Munich (DE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 436 days.

(21) Appl. No.: **11/667,595**

(22) PCT Filed: **Oct. 6, 2005**

(86) PCT No.: **PCT/EP2005/055037**

§ 371 (c)(1),
(2), (4) Date: **Dec. 22, 2008**

(87) PCT Pub. No.: **WO2006/051026**

PCT Pub. Date: **May 18, 2006**

(65) **Prior Publication Data**

US 2009/0131027 A1 May 21, 2009

(30) **Foreign Application Priority Data**

Nov. 11, 2004 (DE) ......................... 10 2004 054 626

(51) **Int. Cl.**
***H04B 7/00*** (2006.01)

(52) **U.S. Cl.** ........ **455/522**; 370/335; 370/342; 370/329; 370/341; 455/422.1

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,266,321 | B1 | 7/2001 | Pehkonen et al. | |
| 6,330,232 | B1 * | 12/2001 | Fapojuwo | 370/342 |
| 6,865,393 | B1 * | 3/2005 | Baum et al. | 455/452.2 |
| 2002/0012332 | A1 * | 1/2002 | Tiedemann et al. | 370/335 |
| 2004/0066795 | A1 * | 4/2004 | Zhang | 370/442 |
| 2005/0281219 | A1 * | 12/2005 | Kim et al. | 370/328 |
| 2008/0159184 | A1 * | 7/2008 | Niwano | 370/278 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 198 23 504 | 12/1998 |
| EP | 1 154 667 A2 | 11/2001 |
| EP | 1 229 755 A2 | 8/2002 |
| EP | 1 545 040 | 6/2005 |
| EP | 1 365 520 B1 | 7/2005 |
| EP | 1 564 905 A2 | 8/2005 |
| JP | 11-74834 | 3/1999 |
| JP | 2002-118515 | 4/2002 |
| WO | 03/001681 | 1/2003 |

OTHER PUBLICATIONS

International Search Report for International Application No. PCT/EP2005/055037; mailed Jan. 9, 2006.
English Abstract for JP 2004-320164 A, Published Nov. 11, 2004.

* cited by examiner

*Primary Examiner* — Ajit Patel
(74) *Attorney, Agent, or Firm* — Staas & Halsey LLP

(57) **ABSTRACT**

In a radio communications system, several codes for transmitting messages are assigned to a subscriber station. A transmission power differential is determined between the total maximum transmission power of the subscriber station for the codes and the total transmission power of the subscriber station for the codes at the beginning of a message transmission, (the differential being respected by the subscriber station), by a first one of the codes.

**19 Claims, 1 Drawing Sheet**




DCH
EDCH
NET
NODE B
UE

# METHOD FOR MULTICODE TRANSMISSION BY A SUBSCRIBER STATION

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is based on and hereby claims priority to German Application No. 10 2004 054 626.6 filed on Nov. 11, 2004, the contents of which are hereby incorporated by reference.

## BACKGROUND

Described below are methods for operating a radio communication system wherein a subscriber station is assigned a first and a second code for the purpose of transmitting messages.

In radio communication systems, messages containing, for example, voice information, image information, video information, SMS (Short Message Service), MMS (Multimedia Messaging Service) or other data are transmitted between a transmitting radio station and a receiving radio station via a radio interface with the aid of electromagnetic waves. Depending on the physical embodiment of the radio communication system, the radio stations in this case can be different types of subscriber radio stations or network-side radio stations such as base stations. In a mobile radio communication system at least some of the subscriber stations are mobile radio stations. The electromagnetic waves are emitted by carrier frequencies that lie in the frequency band provided for the respective system.

Mobile radio communication systems are often embodied as cellular systems, for example conforming to the GSM (Global System for Mobile Communication) or UMTS (Universal Mobile Telecommunications System) standard, having a network infrastructure formed of base stations, devices for monitoring and controlling the base stations and further network-side equipment. Apart from these cellular, hierarchical radio networks organized as wide area (supralocal) networks there are also wireless local networks such as, for example, WLANs (Wireless Local Area Networks) having a radio coverage area that is generally considerably more limited geographically. The cells covered by the radio access points (AP: Access Point) of the WLANs are usually small compared with typical mobile radio cells. Examples of different standards for WLANs are HiperLAN, DECT, IEEE 802.11, Bluetooth and WATM.

Access by subscriber stations to the common transmission medium is controlled in radio communication systems by multiple access (MA) methods/multiplex methods. With these multiple access techniques the transmission medium can be divided up between the subscriber stations in the time domain (Time Division Multiple Access, TDMA), in the frequency domain (Frequency Division Multiple Access, FDMA), in the code domain (Code Division Multiple Access, CDMA) or in the space domain (Space Division Multiple Access, SDMA). Combinations of multiple access methods are also possible.

With code division multiple access methods, subscriber-specific codes are used for communication with subscriber stations, with the result that in the downlink direction the respective subscriber station or, as the case may be, in the uplink direction network-side devices can differentiate the messages to or from the subscriber station from the messages to or from other subscriber stations by establishing a correlation between the received signal and the subscriber-specific code. It is possible for a subscriber station to use a plurality of



codes for transmitting messages. In this case the different codes serve to distinguish different transmission channels used by the subscriber station, such as, for example, to distinguish between channels for transmitting payload and signaling information, or to distinguish channels of different services.

## SUMMARY

An aspect is to disclose an efficient method for operating a radio communication system wherein a subscriber station is assigned a first and a second code for the purpose of transmitting messages. Devices for performing the method are also to be presented.

According to a first method for operating a radio communication system, a subscriber station is assigned a plurality of codes for transmitting messages. A transmit power difference to be maintained by the subscriber station is determined between on the one hand the total maximum transmit power of the subscriber station for the plurality of codes and on the other hand the total transmit power of the subscriber station for the plurality of codes at the start of a message transmission using a first of the plurality of codes.

According to a second method for operating a radio communication system wherein a subscriber station is assigned a plurality of codes for transmitting messages, a previously determined transmit power difference is maintained by the subscriber station between on the one hand the total maximum transmit power of the subscriber station for the plurality of codes and on the other hand the total transmit power of the subscriber station for the plurality of codes at the start of a message transmission using a first of the plurality of codes.

The subscriber station is assigned at least a first and a second code for the purpose of transmitting messages. Each of the different codes can be a combination of a plurality of individual codes; thus, according to UMTS, for example, the combination consisting of a spreading and a scrambling code. In addition to the plurality of codes that are involved in the method described below, further codes can also be used by the subscriber station for the purpose of transmitting messages.

A transmit power difference which is to be maintained by the subscriber station between a first and a second transmit power is determined. A difference between two values is maintained if the distance between the two values is greater than or equal to the difference. The first of the two transmit powers is the total maximum transmit power of the subscriber station for the plurality of codes, i.e. the maximum transmit power, when the subscriber station uses the plurality of codes in parallel for transmitting messages. The maximum transmit power for the parallel use of a plurality of codes is preferably predetermined by the hardware of the subscriber station, which is to say, for example, by the power amplifier which is intended to amplify in a linear manner but produces a non-linear signal distortion in the power end range, for which reason it is not used in the end range. It is, however, also possible for the maximum transmit power for the parallel use of a plurality of codes of the subscriber station to be predefined on the network side.

The second of the two transmit powers is the total transmit power of the subscriber station for the plurality of codes at the start of a message transmission using a first of the codes. This corresponds to the sum of the transmit power for the first code and the transmit power for the remaining code or codes, and moreover in each case at the time of the start of the message transmission using the first code. If no message transmission using the remaining code or codes is performed precisely at the time of the start of the message transmission using the first

code, but instead is only initiated a short time later, then the transmit power for the remaining code or codes at the point in time occurring a short time later can be used for the sum forming operation described.

If messages are transmitted using the first code at specific time intervals rather than continuously, the start of a time interval of this kind corresponds to the start of the message transmission using the first code. The method described below can be applied in relation to any such start time, i.e. to any message transmission using the first code, or to a subset of the start times.

The radio communication system under consideration can be a cellular mobile radio communication system, in particular a UTMS radio communication system, or also a local radio communication system.

the transmit power difference may be determined on the network side and a base station sends the subscriber station a message containing information relating to the determined transmit power difference. In this case the transmit power difference is determined not by the subscriber station, but by one or more devices of the infrastructure network of the radio communication system, in particular by the base station. After the network-side determination of the transmit power difference, information relating to the determined transmit power difference is notified to the subscriber station so that the subscriber station can extract the transmit power difference from the information or determine the transmit power difference from the information.

It is advantageous if the message to the subscriber station also contains information relating to a maximum data rate to be used by the subscriber station for the message transmission using the first code.

The transmit power difference may be determined as a function of a property of the base station and/or the radio cell of the base station, and/or of an interference situation, and/or of at least one service used by the subscriber station, and/or of a classification of the subscriber station. In this way the transmit power difference can be defined differently from base station to base station or, as the case may be, from radio cell to radio cell under conditions that are otherwise identical. With regard to the interference, the interference within the cell to which the subscriber station is assigned, and/or within cells adjacent to this cell, can be taken into account. It is advantageous in particular to take into account the type of service used by the subscriber station by transmitting messages using the first code during the determination of the transmit power difference. Subscriber stations can be classified or prioritized on the network side and handled in accordance with this classification during the determination of the transmit power difference.

The transmit power difference may be determined by the subscriber station. This difference can be determined in particular as a function of a plurality of transmit powers used in the past by the subscriber station for a second code, in particular using the variance of these transmit powers. This taking into account of the transmit powers used in the past can also be indirect, in that power control information received by the subscriber station in respect of the transmit powers used for the second code is used.

The network-side device and the subscriber station can have a transmit power difference which is to be maintained by the subscriber station between, on the one hand, the total maximum transmit power of the subscriber station for the plurality of codes and, on the other hand, the total transmit power of the subscriber station for the plurality of codes at the start of a message transmission using a first of the plurality of codes.

In addition or alternatively, the subscriber station can maintain a previously determined transmit power difference between, on the one hand, the total maximum transmit power of the subscriber station for the plurality of codes and, on the other hand, the total transmit power of the subscriber station for the plurality of codes at the start of a message transmission using a first of the plurality of codes.

## BRIEF DESCRIPTION OF THE DRAWINGS

These and other objects and advantages will become more apparent and more readily appreciated from the following description of an exemplary embodiment, taken in conjunction with the accompanying drawings of which:

FIG. **1** is a pictorial diagram of a portion of a radio communication system.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Reference will now be made in detail to the preferred embodiments, examples of which are illustrated in the accompanying drawings, wherein like reference numerals refer to like elements throughout.

FIG. **1** shows a section of a UMTS radio communication system with a subscriber station UE (UE: User Equipment) and a base station NODE B. The base station NODE B is connected to further network-side devices of the infrastructure network NET. In the uplink (UL) direction the communication, i.e. the message transmission from the subscriber station UE to the base station NODE B, takes place on a dedicated channel, described, for example, in [3GPP TS 25.211 V6.2.0, 3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Physical channels and mapping of transport channels onto physical channels (FDD)]. For this purpose the subscriber station UE is assigned the code DCH. A second code EDCH (Enhanced Dedicated Uplink Channel) is assigned to the subscriber station UE, in particular for transmitting high bit rate traffic.

In order to regulate the power in accordance with a closed loop power control, the base station NODE B sends the subscriber station UE power control instructions, the TPC bits, at regular intervals, i.e. information as to whether the transmit power is to be increased or decreased by the subscriber station UE. The subscriber station UE is subject to a maximum value for the transmit power which cannot be exceeded. In deteriorating radio transmission conditions the subscriber station UE is requested by the base station NODE B to increase its transmit power. The transmit power can be increased at most up to the maximum value of the transmit power of the subscriber station UE. If the subscriber station UE receives a further request to increase its transmit power after reaching the maximum value of its transmit power, it can adjust the TFC (Transport Format Combination) used by it. For each physical channel the TFC specifies the ratio of coded data, i.e. the total data, to the payload data, and consequently the data rate. For a given radio channel each TFC is uniquely linked to a transmit power. Under constant radio traffic conditions, therefore, a switch to a TFC with a lower data rate corresponds to a switch to a lower transmit power. In order to comply with the request of the base station NODE B for a transmit power increase, the subscriber station UE can thus switch to a TFC with a lower data rate and leave the transmit power unchanged or reduce it. The switching of a TFC can only take place at specific times, and moreover at specific TTI limits (TTI: Transmission Time Interval).

If the subscriber station UE uses not just the code DCH, but the two codes EDCH and DCH in parallel, the situation in which the subscriber station UE reaches the maximum value of its transmit power occurs more often than if the subscriber station UE uses only the code DCH. There are the following reasons for this:

The total transmit power of the subscriber station UE when using a plurality of codes is produced from the sum of the transmit powers of the individual codes. The total transmit power of the subscriber station UE is therefore higher on average, the more codes it uses.

The code EDCH is intended to be used for transmitting high bit rate data packets to the base station NODE B. In keeping with the link between data rate and transmit power via the TFC, the subscriber station UE requires a higher transmit power for the code EDCH than for the code DCH.

If the subscriber station UE uses the two codes EDCH and DCH in parallel, the maximum value of the transmit power can be reduced compared with the case where it uses only the code DCH. The reason for this is that in a multicode transmission the PAR value (PAR: Peak to Average Ratio) can be worse. This reduction in the maximum transmit power in a multicode transmission applies to most subscriber stations; if this reduction were to be avoided, higher requirements in terms of the linearity of the amplifiers of the subscriber stations would be necessary.

The length of an EDCH message (TTI: Transmission Time Interval) is 10 ms. During this time the subscriber station UE receives 15 TPC bits. The TFC for the code EDCH cannot be changed during the TTI, i.e. the subscriber station UE can respond to an instruction from the base station NODE B to increase its transmit power only by increasing the transmit power; adjusting the TFC for the code EDCH is not possible during the transmission of an EDCH message. Another possible way to respond to the request from the base station NODE B to increase the transmit power is to adjust the TFC for the code DCH. This can be switched by the subscriber station UE at the start of a TTI for the code DCH. The times of the TTI start of the two codes DCH and EDCH can be different from each other. In this way it is possible for the subscriber station UE to comply with the request to increase the transmit power during the transmission of an EDCH message by changing the TFC for the code DCH and thereby enabling the transmit power for the code EDCH to be increased if a suitable TTI limit for switching over the TFC is present. This is only possible, however, if the subscriber station UE is not already using the lowest possible data rate for the code DCH. However, this smallest TFC corresponding to the lowest possible data rate is always used by the subscriber station UE when it has little data to be transmitted using the code DCH.

If when using the two codes EDCH and DCH the subscriber station UE reaches the (reduced) maximum value of the transmit power during the transmission of an EDCH message, and if it receives instructions from the base station NODE B to continuously increase its transmit power, it must abort the transmission of the EDCH message before the end of the EDCH message if an adjustment of the TFC of the code DCH is not possible. Aborting the message transmission of the code DCH is not possible, for if the base station NODE B can no longer receive the messages of the code DCH, the connection between the base station NODE B and the subscriber station UE is interrupted, with the result that the maintaining of the communication using the code DCH for upholding the connection between subscriber station UE and base station NODE B is indispensable. Aborting the transmission of the EDCH message means wasting radio resources, since the incomplete EDCH message cannot be evaluated on the network side, yet interference has been generated due to the incomplete transmission of the EDCH message.

The subscriber station UE is notified by the base station NODE B prior to the transmission of an EDCH message of which TFC may be used at a maximum for this transmission, i.e. the maximum possible data rate for the EDCH message. Before the transmission of the EDCH message the subscriber station UE specifies a TFC which will be used for the EDCH message, taking into account that the maximum data rate assigned to it by the base station NODE B may not be exceeded. According to the radio traffic conditions or, as the case may be, the radio channel between the subscriber station UE and the base station NODE B, a specific transmit power for the transmission of the EDCH message is linked to the selected TFC under constant propagation conditions.

If the subscriber station UE chooses a high data rate and therefore a high transmit power for the transmission of the EDCH message, it is possible that it will receive a request to increase the transmit power several times during the transmission of the EDCH message, which ultimately can lead, as described in the foregoing, to the abortion of the transmission of the EDCH message since the maximum transmit power of the subscriber station UE would have been exceeded. If, on the other hand, the subscriber station UE chooses a low data rate and therefore a low transmit power for the transmission of the EDCH message, it is possible that if there are few requests to increase the transmit power a large part of the total transmit power available to the subscriber station UE will not be used and consequently a lower data rate was used for the EDCH message than would be possible and desirable from the point of view of the subscriber station UE. In selecting the TFC for the transmission of an EDCH message a compromise must therefore be found between a high data rate for the EDCH message and a reliable, i.e. complete, transmission of the EDCH message.

In order to solve this problem, it is proposed that a transmit power difference which is to be maintained by the subscriber station UE be determined by the base station NODE B. The transmit power difference, which can be termed the "power headroom", is required to exist between the total transmit power for the two codes DCH and EDCH at the start of the transmission of an EDCH message and the maximum transmit power for the two codes DCH and EDCH. The transmit power difference thus corresponds to an unused transmit power at the start of the transmission of an EDCH message. For illustration purposes a numeric example will be considered:

The maximum transmit power of the subscriber station UE when using only the code DCH, i.e. without multicode transmission, is 21 dBm.

Let the maximum transmit power of the subscriber station UE when using the two codes DCH and EDCH be reduced by 3 dB compared to the maximum transmit power when using only one code, i.e. it amounts to 21 dBm−3 dB=18 dBm.

For the code DCH let the subscriber station UE use the minimum possible data rate, this corresponding to a transmit power for the code DCH of 3 dBm given a specific assumed radio propagation condition. Thus, a maximum of 18 dBm−3 dB=15 dBm is available for the code EDCH.

Let the base station NODE B specify a transmit power difference of 8 dB for the subscriber station UE. This

yields the maximum transmit power to be used by the subscriber station UE at the start of the transmission of the EDCH message as: 18 dBm−3 dB−8 dB=7 dBm.

The transmit power difference can be determined in the base station NODE B as a function of a number of parameters:

The Type of Cell of the Base Station NODE B.

A distinction can be made between "capacity limited" and "coverage limited" cells. A "capacity limited" cell is a cell in which the transmit power of the base station that is to be divided up among the subscriber stations in the downlink direction is the limiting factor for the cell size. This applies mostly to small cells in urban areas. The subscriber stations in such cells generally transmit at low transmit power, so the maximum transmit power of the subscriber stations is seldom reached. No large "power headroom" must therefore be set for a "capacity limited" cell, i.e. a base station of a "capacity limited" cell defines only small transmit power differences. A "coverage limited" cell is a cell in which the transmit power of the subscriber stations in the uplink direction is the limiting factor for the cell size. This applies mostly to large cells in rural areas. Since the subscriber stations of a "coverage limited" cell frequently reach their maximum transmit power, a large "power headroom" should be set at the start of the transmission of an EDCH message to ensure that sufficient scope for increasing the transmit power during the transmission of the EDCH message is present. A base station of a "coverage limited" cell will therefore define high transmit power differences.

The Current Interference Situation in the Cell or in an Area Formed by a Plurality of Cells.

The greater the current interference in a cell and/or in the surrounding cells, the higher the transmit power differences should be specified. The consequence of this is that subscriber stations which are located in the vicinity of the receiving base station and which therefore require a low transmit power and so generate little interference receive preference, i.e. achieve greater data rates for the EDCH messages than the more remote subscriber stations. Owing to the fact that the subscriber stations in the vicinity of the base station must use only low transmit powers to achieve high data rates, their EDCH transmissions scarcely experience any restrictions due to large transmit power differences. In contrast, subscriber stations which are very distant from the base station are subject to restrictions in respect of the transmission of EDCH messages, since only a low data rate is possible for the EDCH messages due to the great distance from the receiving base station or during the soft handover to the receiving base stations and due to the high transmit power difference, with the consequence that many of these subscriber stations must forego the transmission of EDCH messages. As a result the subscriber stations generate little interference in the surrounding cells. Specifying the transmit power difference thus represents a controlling intercell interference.

The Service Used by a Subscriber Station in Respect of the Code EDCH.

A distinction can be made between two basic types of services. Firstly there are services in which a minimum service rate is guaranteed (referred to as the Guaranteed Bit Rate, or GBR). These can be realtime services in which a reliable transmission is necessary, such as, for example, videotelephony and online gaming. A high transmit power difference should be specified for these services so that even if the radio channel deteriorates during the transmission of an EDCH message this can be made up for by an increase in the transmit power and the EDCH message can be transmitted without having to be aborted. Secondly there are services in which a high data rate is required, while an occasional breakdown in the transmission of an EDCH message does not have an overly negative impact. The aborted EDCH messages can be transmitted in full at a later time. Examples of this are non-realtime games. A low transmit power difference should be specified for the latter-mentioned services to ensure that a high data rate (maximum throughput) can be achieved for the EDCH messages.

The Strategy of the Network Operator in Respect of the EDCH.

If a high data throughput is to be achieved overall for all users via the EDCH, low transmit power differences should be defined by the base stations.

The Class of the Subscriber Station.

The subscriber stations can be classified, with subscriber stations belonging to a higher priority class having to maintain a lower transmit power difference than subscriber stations belonging to a lower priority class. Threshold values, for example, can be used as maximum values of the transmit power difference for subscriber stations belonging to certain classes. The lowering of the transmit power difference as the priority of the subscriber stations increases can be explained by the fact that the base station must divide up the total interference that is tolerable for the EDCH at its receiver for the EDCH channel of all subscriber stations between the subscriber stations. In particular the subscriber stations which are at a great distance from the base station generate an increased amount of interference. Using a low transmit power difference, a high priority subscriber station is allocated a large proportion of the interference that is to be divided up between the subscriber stations. When a high transmit power difference is to be maintained a subscriber station can decide that the respective data rate for the EDCH message is so small that it will dispense with the transmission of the EDCH message. If a high value for the transmit power difference is determined for the subscriber stations when a high level of interference is present, it is possible at these times for EDCH messages to be transmitted only by subscriber stations which have been assigned a high priority, since the defined transmit power difference is too high for the transmission of an EDCH message for the lower priority subscriber stations. The classification can have an effect on the billing of the respective subscriber.

When determining the transmit power difference the base station NODE B can use one of the described parameters or combinations of the parameters. The transmit power difference can be determined on a subscriber-station-specific basis, i.e. for individual subscriber stations, or for a group of subscriber stations or for all subscriber stations which use a code EDCH.

The transmit power difference is signaled to the subscriber station UE by the base station NODE B. It is possible that the subscriber station UE has to maintain the transmit power difference exactly, i.e. that the sum formed from the transmit powers for the two codes DCH and EDCH at the start of the transmission of the EDCH message differs from the maximum transmit power available for the two codes DCH and EDCH precisely by the transmit power difference, or that the transmit power difference defined by the base station NODE B represents a minimum value which must be present at least between the sum of the transmit powers for the two codes DCH and EDCH at the start of the transmission of the EDCH message and the maximum transmit power available for the two codes DCH and EDCH. The determined transmit power difference can be signaled using a message introduced specifically for these purposes, though the information relating to the transmit power difference can also be integrated into another message. It is advantageous in particular if a message

is sent from the base station NODE B to the subscriber station UE containing both the specification of the transmit power difference requiring to be maintained and the specification of the TFC with the maximum data rate that may be used by the subscriber station UE for the respective transmission of the EDCH message. If the same transmit power difference is determined for a plurality of subscriber stations, these can be informed of the defined transmit power difference in a joint notification.

While the case has been described in which the transmit power difference is determined by the base station, the transmit power difference can also be determined by a device controlling the base station NODE B, such as, for example, by a CRNC (Controlling RNC). This device then informs the base station NODE B of the defined transmit power difference. As described above in relation to the message transmission between base station and subscriber station, the information relating to the defined transmit power difference is preferably contained in a message which also includes the specification of the TFC with the maximum data rate that may be used by the subscriber station for the respective transmission of the EDCH message.

As an alternative to the transmit power difference being defined by the base station NODE B, it can also be determined by the subscriber station UE. In this case the subscriber station UE can take into account the instructions received in the past concerning the transmit power control in relation to the code DCH, i.e. the TPC bits. If the transmit power for the code DCH within a specific period of time in the past lies, for example in the range between −10 dBm and +10 dBm, i.e. if the transmit power for the code DCH exhibits a great variance, the transmit power difference will be defined as a higher value by the subscriber station UE than in the case of a small variance, which is to say, for example, if the transmit power for the code DCH within the specific period of time in the past lies in the range between −3 dBm and +3 dBm. Thus, the variance of the transmit powers of a first channel, of the code DCH, is used to determine the transmit power for a second channel, for the code EDCH. The actual value for the transmit power of the code EDCH is determined by the subscriber station from the transmit power difference, the current value of the transmit power for the code DCH, the TFC for the code EDCH, the maximum value of which is predefined for it by the base station NODE B, its maximum transmit power for multicode transmission, and the current radio transmission conditions.

A description has been provided with particular reference to preferred embodiments thereof and examples, but it will be understood that variations and modifications can be effected within the spirit and scope of the claims which may include the phrase "at least one of A, B and C" as an alternative expression that means one or more of A, B and C may be used, contrary to the holding in *Superguide v. DIRECTV,* 358 F3d 870, 69 USPQ2d 1865 (Fed. Cir. 2004).

The invention claimed is:

**1**. A method for operating a radio communication system in which a subscriber station is assigned a plurality of codes for transmitting messages, comprising:

determining a transmit power difference which is to be maintained by the subscriber station between on one hand a total maximum transmit power of the subscriber station for the codes and on another hand a total transmit power of the subscriber station for the codes at a start of a message transmission using a first one of the codes.

**2**. The method as claimed in claim **1**,

wherein said determining of the transmit power difference is performed by a network device, and wherein said method further comprises sending from a base station to the subscriber station a message containing information relating to the transmit power difference as determined by the network device.

**3**. The method as claimed in claim **2**, wherein the message to the subscriber station contains information relating to a maximum data rate to be used by the subscriber station for the message transmission using the first code.

**4**. The method as claimed in claim **3**, wherein said determining of the transmit power difference is based on a function of at least one of a property of the base station, a property of a radio cell of the base station, an interference situation, at least one service used by the subscriber station, and a classification of the subscriber station.

**5**. The method as claimed in claim **2**, wherein said determining of the transmit power difference is based on a function of at least one of a property of the base station, a property of a radio cell of the base station, an interference situation, at least one service used by the subscriber station, and a classification of the subscriber station.

**6**. The method as claimed in claim **1**, wherein said determining of the transmit power difference is performed by the subscriber station.

**7**. The method as claimed in claim **6**, wherein said determining of the transmit power difference is based on a function of a plurality of transmit powers used previously by the subscriber station for a second of the codes.

**8**. The method as claimed in claim **7**, wherein the radio communication system is a Universal Mobile Telecommunications System radio communication system.

**9**. A method for operating a radio communication system in which a subscriber station is assigned a plurality of codes for transmitting messages, comprising:

maintaining a previously determined transmit power difference by the subscriber station between on one hand a total maximum transmit power of the subscriber station for the codes and on another hand a total transmit power of the subscriber station for the codes at a start of a message transmission using a first one of the codes.

**10**. The method as claimed in claim **9**, wherein the transmit power difference is determined on the network side and a base station sends the subscriber station a message containing information relating to the defined transmit power difference.

**11**. The method as claimed in claim **10**, wherein the message to the subscriber station contains information relating to a maximum data rate to be used by the subscriber station for the message transmission using the first code.

**12**. The method as claimed in claim **11**, wherein said determining of the transmit power difference is based on a function of at least one of a property of the base station, a property of a radio cell of the base station, an interference situation, at least one service used by the subscriber station, and a classification of the subscriber station.

**13**. The method as claimed in claim **10**, wherein said determining of the transmit power difference is based on a function of at least one of a property of the base station, a property of a radio cell of the base station, an interference situation, at least one service used by the subscriber station, and a classification of the subscriber station.

**14**. The method as claimed in claim **9**, wherein said determining of the transmit power difference is performed by the subscriber station.

**15**. The method as claimed in claim **14**, wherein said determining of the transmit power difference is based on a function of a plurality of transmit powers used previously by the subscriber station for a second of the plurality of codes.

**16**. The method as claimed in claim **15**, wherein the radio communication system is a Universal Mobile Telecommunications System radio communication system.

**17**. A base station in a radio communication system in which a subscriber station is assigned a plurality of codes for transmitting messages, comprising:

at least one processor programmed to determine a transmit power difference which is to be maintained by the subscriber station between on one hand a total maximum transmit power of the subscriber station for the codes and on another hand a total transmit power of the subscriber station for the codes at a start of a message transmission using a first one of the codes.



**18**. A subscriber station for a radio communication system, the subscriber station assigned a plurality of codes for transmitting messages, comprising:

at least one processor programmed to determine a transmit power difference which is to be maintained by the subscriber station between on one hand a total maximum transmit power of the subscriber station for the codes and on another hand a total transmit power of the subscriber station for the codes at a start of a message transmission using a first one of the codes.

**19**. A subscriber station as claimed in claim **18**, wherein said at least one processor is further programmed to maintain the transmit power difference.

* * * * *