**2016-1880**

# United States Court of Appeals for the Federal Circuit

HTC CORPORATION, ZTE (USA) INC.

*Appellants,*

v.

CELLULAR COMMUNICATIONS EQUIPMENT, LLC

*Appellee.*

*Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Case No. IPR2014-01134*

**BRIEF OF APPELLEE**
**CELLULAR COMMUNICATIONS EQUIPMENT, LLC**

Barry J. Bumgardner
barry@nelbum.com
John P. Murphy
murphy@nelbum.com
NELSON BUMGARDNER, P.C.
3131 W. 7th Street, Suite 300
Fort Worth, Texas 76107
[Tel.] (817) 377-9111
[Fax] (817) 377-3485

*Counsel for Appellee Cellular Communications Equipment, LLC*

November 28, 2016

**CELLULAR COMMUNICATIONS EQUIPMENT, LLC'S CERTIFICATE OF INTEREST**

Counsel for Appellee Cellular Communications Equipment, LLC ("CCE") certifies the following:

1. The full name of every party represented by me is Cellular Communications Equipment, LLC.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is: None.

3. The names of all parent corporations and publicly held companies that own 10 percent or more of the stock in CCE are Acacia Research Group LLC and Acacia Research Corporation.

4. The names of all law firms and the partners or associates that appeared for CCE in the IPR proceeding before the Patent Trial and Appeal Board, or are expected to appear in this Court, are:

Barry J. Bumgardner
barry@nelbum.com
John P. Murphy
murphy@nelbum.com
**NELSON BUMGARDNER, P.C.**
3131 W. 7th Street, Suite 300
Fort Worth, Texas 76107
[Tel.] (817) 377-9111
[Fax] (817) 377-3485

Amedeo F. Ferraro
aferraro@martinferraro.com
**MARTIN & FERRARO, LLP**
17383 Sunset Boulevard, Suite 250
Los Angeles, California 90272
[Tel.] (310) 286-9800

Jerry Cohen
jcohen@burnslev.com
[Tel.] (617) 345-3276
Stephen Y. Chow
schow@burnslev.com
[Tel.] (617) 345-3263
David Gomes
dgomes@burnslev.com
[Tel.] (617) 345-3267
Hsuanyeh Chang, PhD
hchang@burnslev.com
[Tel.] (617) 345-3218
**BURNS & LEVINSON LLP**
125 Summer Street
Boston, Massachusetts 02110
[Fax] (617) 345-3299

# TABLE OF CONTENTS

***Page***

CERTIFICATE OF INTEREST ........ i

TABLE OF AUTHORITIES ........ v

STATEMENT OF RELATED CASES ........ 1

JURISDICTIONAL STATEMENT ........ 1

ISSUES PRESENTED FOR REVIEW ........ 1

STATEMENT OF THE CASE ........ 1

A. Preliminary Statement ........ 1

B. Cell Phone Technology ........ 4

C. Overview of the ’174 Patent ........ 7

D. Overview of Baker ........ 11

E. Overview of Reed ........ 15

F. The PTAB Proceeding ........ 16

STANDARDS OF REVIEW ........ 19

SUMMARY OF THE ARGUMENT ........ 20

ARGUMENT ........ 22

A. HTC’s “Entire Argument” Regarding Baker Was Improper ........ 22

B. Baker Fails to Disclose the Claimed Inventions ........ 24

C. HTC’s Arguments Are Not Persuasive ........ 28

D. Construction of Message ........ 29

E. Reed ........ 31

CONCLUSION ........ 35

CERTIFICATE OF SERVICE ........................................................................37

CERTIFICATE OF COMPLIANCE ......................................................................38

# TABLE OF AUTHORITIES

***Page(s)***

**Cases**

*In re Robertson*,
169 F.3d 743 (Fed. Cir. 1999)....................27

*Kennametal, Inc. v. Ingersoll Cutting Tool Co.*,
780 F.3d 1376 (Fed. Cir. 2015)....................20

*Rambus Inc. v. Rea*,
731 F.3d 1248 (Fed. Cir. 2013)....................20

*Star Fruits S.N.C. v. United States*,
393 F.3d 1277 (Fed. Cir. 2005)....................19

**Other Authorities**

Office Patent Trial Practice Guide,
77 Fed. Reg. 48,756, 48,768 (Aug. 14, 2012) ....................23

## STATEMENT OF RELATED CASES

Cellular Communications Equipment, LLC ("CCE") is satisfied with HTC Corporation ("HTC") and ZTE (USA), Inc.'s ("ZTE") Statement of Related Cases.

## JURISDICTIONAL STATEMENT

CCE is satisfied with HTC and ZTE's Jurisdictional Statement.

## ISSUES PRESENTED FOR REVIEW

1. Whether the Board's finding that HTC and ZTE failed to prove by a preponderance of the evidence that Baker anticipates Claims 1, 6, 9, 14, 18, and 19 of the '174 Patent is supported by substantial evidence?

2. Whether the Board's finding that HTC and ZTE failed to prove by a preponderance of the evidence that Baker and Love, or, Baker and Reed, suggest Claims 1, 6, 9, 14, 18, and 19 of the '174 Patent is supported by substantial evidence?

## STATEMENT OF THE CASE

### A. Preliminary Statement

The patent that is the subject of this appeal and the underlying IPR, U.S. Pat. No. 7,941,174 (the "'174 Patent), claims a method (Claims 1 and 9) and apparatus (Claim 18) relating to how a cellular device (e.g., a cell phone) determines power headroom at the beginning of a "message transmission." Power headroom refers to the power for transmitting radio signals held in reserve by the cellular device. For

example, if a cell phone was transmitting a signal at 10 Watts (W) and had a maximum power level of 20W, the phone would be said to have 10W of headroom. The ’174 Patent describes reserving some power at the beginning of a message transmission so that the cell phone has some ability to increase the power of its transmission at a later point in time.

On the other hand, the primary prior art reference, U.S. Patent Pub. No. 2008/0151840 to Baker (“Baker”), describes lowering the power used to transmit information so that an acknowledge/not-acknowledged signal (referred to as an “ACK/NACK signal”) can be transmitted to a base station along with the other, on-going transmissions. ACKs/NACK signals are simple signals to acknowledge (or not) the receipt of a previous communication to the phone from a base station. Baker adjusts its power at what are known as time slot boundaries. It adjusts the power at the time slot boundary immediately preceding the transmission of the ACK/NACK signal. After the ACK/NACK signal is transmitted, Baker describes increasing the power of the on-going transmissions back to level where it was prior to the ACK/NACK transmission. Baker is not concerned with setting the power headroom of a phone at the beginning of a message. In fact, the term “message” is not used in Baker.

HTC and ZTE (collectively referred to as HTC from this point forward) argued that because Baker discloses adjusting the power at a time slot boundary, it

anticipates the claims of the ’174 Patent. CCE responded that since Baker does not discuss “messages,” it cannot disclose lowering the power of a transmission at the start of one.

On these facts, the Board concluded that Baker did not anticipate the ’174 Patent. In analyzing the same arguments HTC puts forward in its Opening Brief, the Board found that HTC had “not shown sufficiently that the boundary of the frame or timeslot immediately preceding the ACK or NACK signal in Baker is the start of a message transmission” as required by Claims 1, 6, 9, 14, 18, and 19 of the ’174 Patent (collectively, the “Challenged Claims”). Final Written Decision at 11, Appx11. Having found that Baker does not explicitly disclose determining the headroom of a transmission at the beginning of a message, the Board analyzed Baker to determine whether it *inherently* discloses such behavior. Again, the Board determined that Baker does not anticipate the Challenged Claims, noting “the mere possibility that the start of a frame may correspond to the start of a message transmission is not sufficient to show that Baker anticipates the challenged claims.” *Id.* at 12, Appx12.

In its Opening Brief, HTC makes much of the Board’s alleged erroneous construction of the term “message.” *See* Appellants’ Corrected Opening Brief (Dkt. 29) (“Appellants’ Opening Brief”) at 34-42. These arguments are a red herring. The fact of the matter is that the Board did not construe the term

"message." This is implicitly noted by HTC where it mentions the Board's "apparent interpretation" of "message." *Id.* at 41. The reality is that the Board did not explicitly construe the term "message." Instead, it found that Baker simply does not disclose messages of any form. Since Baker does not disclose messages at all, the Board's findings are not surprising and are correct.

Finally, with respect to HTC's rejected obviousness arguments regarding Reed and Baker (and Reed and Love), the Board made specific factual findings with respect to what Reed discloses, and based on those (correct) findings, determined that these combinations did not render obvious the Challenged Claims.

### B. Cell Phone Technology

In traditional cellular telephone systems, communications between cell phones and base stations occur over a limited set of frequencies. Stated differently, there are not near enough frequencies to assign each phone its own for the purposes of sending and receiving data. Declaration of Dr. Esmael Dinan, Expert for Patent Owner, ("Dinan Dec."), ¶18, Appx2123. Instead, phones must share the available frequencies. This sharing is done by the phones taking turns sending and receiving information over the same set of frequencies. *Id.* For example, at one moment in time, phone A may send information over frequency 1930 MHz, while in the next moment, phone B may be using the same frequency for its own

transmissions. Generally speaking, phones cannot use the same frequencies at the same time, else, neither phone's transmissions will be properly heard.

In CDMA systems, this traditional use of frequencies is altered, but the general principle of phones having to share limited resources to send and receive data remains the same. In CDMA systems, such as UMTS, instead of being assigned a frequency to transmit data, a phone is assigned a spreading code. *Id*. at ¶20, Appx2124. Like frequencies in traditional cellular systems, there are a finite number of spreading codes in a CDMA system and, generally speaking, the same code cannot be used by different phones at the same time. Thus, phone A can use code 11 at a particular moment in time, then, at a different moment, phone B can use the same code.

Phones operating in a given area (*i.e.*, in the range of a particular base station) have very accurate internal clocks that track time periods to accomplish this sharing of frequencies/codes. In UMTS systems, the phones track time periods of 666 microseconds. These 666 microsecond periods are referred to as time slots (for reference, there are approximately 1500 timeslots in one second). *Id.* at ¶25, Appx2126-2127. The clocks in cellular phones are all synchronized such that they all know when a particular time slot begins and ends. This allows the phones to share resources. For example, a base station can tell phone A that it can use code 22 to transmit information for the next 10 time slots. The same base

station can then tell phone B that it can start transmitting using the same code 22 starting at the eleventh time slot. After 10 time slots, phone A will cease its transmissions and phone B will start its transmissions. For uplink transmissions from phones to a base station, the base station acts as a conductor and assigns phones in its geographical area of coverage various codes for certain numbers of time slots so that the phones can take turns sending data to the cellular network using the limited pool of codes.

For organizational purposes, time slots are grouped into larger categories in UMTS systems (as well as other cellular systems). In UMTS, groups of 15 time slots are referred to as frames. *Id.* A frame lasts 10 milliseconds (15 x 666 microseconds – there are 100 frames in one second). Thus, the point in time that marks the end of the 15th time slot in a sequence will be both a time slot boundary and a frame boundary. *Id.* Beyond frames, there are super frames. Super frames consist of 72 frames (1080 time slots, lasting 0.72 seconds).

The acronym "EDCH" stands for Enhanced Dedicated Uplink Channel. '174 Patent at 4:38-9, Appx31. The EDCH is used to send high bit rate data packets to a base station. This channel was added to existing UMTS cellular systems in order to accommodate higher uplink (in the direction of the phone to a base station) data rates. Declaration of Dr. Tim A. Williams, Petitioners' Expert, ("Williams Dec.") at ¶35, Appx797. As is true in most instances, transmitting data

at higher data rates (such as on the EDCH) requires more power than transmitting at lower data rates (such as on the DCH).

### C. <u>Overview of the ’174 Patent</u>

Claims 1, 6, 9, 14, 18, and 19 of the ’174 Patent were at issue in the IPR and are at issue in this appeal. Claims 1, 9, and 18 are independent claims while Claims 6, 14, and 19 are dependent claims. Claims 1 are 9 are method claims, while Claim 18 is an apparatus claim. The Board and HTC generally analyzed the independent Challenged Claims together, as these claims have similar limitations as far as the issues raised in this appeal. *See* Final Written Decision at 9-19, Appx9-19, and Appellants’ Opening Brief at 31 *et. seq*. CCE agrees that such an analysis is proper.

Generally, the Challenged Claims are directed to a method and apparatus for determining and maintaining transmit power headroom during the transmission of a message. *See* ’174 Patent, Claims 1, 9, and 18, Appx34-35. In short, when beginning the transmission of a message, the phone keeps some power in reserve in case it needs to increase the power of its transmit signal at some point in time during the transmission of the message. As a simple example, if a phone is transmitting a data signal to a cell tower and moves behind a building during this transmission, the strength of the signal as measured at the cell tower may decrease. In response to this decrease in signal strength, the base station may command the

phone to increase its power. Dinan Dec. ¶¶ 22-23, Appx2125-2126. Assuming the phone did not start the transmission of the message at full power, it will have the ability to increase the power of its transmission (up to the physical limits of the phone). In practice, this reserve power is known as headroom. In the claims, it is referred to as the "transmit power difference."

The claims contemplate the phone having been "assigned" a plurality of "codes." These codes refer to CDMA spreading codes, which the phone uses to spread a message over a relatively wide swath of spectrum (as compared to TDMA systems in existence at the time of the invention). CDMA codes are assigned to the phone by the base stations. Typically, a phone will request the base station assign it codes when the phone has data to transmit to the base station. Once the phone is finished with its transmission, the base station will then assign the codes to other phones, as needed. These codes are the equivalent of the phone being given an exclusive radio channel over which it can transmit data. For example, in Claim 1, the phone has been assigned a plurality of such codes ("A method for operating a radio communication system in which a subscriber station is assigned a plurality of codes for transmitting messages . . . ."). '174 Patent, Claim 1, Appx34.

A primary objective of the '174 Patent is to start the transmission of a message using a plurality of codes at a power level that is below the maximum power level of the phone using the same codes. *Id.*, 6:40-9, Appx32. The

difference between the power used at the beginning of the message and the maximum power of the phone is the headroom. *Id.* Absent headroom, the phone cannot increase its transmit power during the transmission of the message. The availability of power headroom is what allows the phone to respond to base station commands to increase transmission power. Dinan Dec. at ¶32, 2131-2.

In determining this headroom, the system described by the ’174 Patent must take in to account that a particular message to be transmitted might be lengthy and, for some codes, once the data rate is set, it cannot be changed. *See* ’174 Patent, 5:26-36, Appx32 (the acronym TFC stands for Transport Format Combination and is directly related to the data rate on the channel – *see id.*, 4:55-8, Appx31). Also, since a plurality of codes are being used to transmit the message, the total maximum transmit power for the plurality of codes must be taken into account (as opposed to the maximum transmit power for a single code). *See id.*, 5:1-28, Appx32. During the transmission of the message, the phone may also be receiving power control commands from the base station. *See id.*, 4:41-53, Appx31. These power control commands can direct the phone to increase or decrease the power of its transmissions. *Id.*

Establishing the proper power headroom at the beginning of a message is important. Generally speaking, if a base station is not properly receiving a transmission from a phone, it can either direct the phone to increase the power of

its transmissions, or it can ask the phone to lower the data rate of its transmission. *See id.*, 4:41-67, Appx31. Either of these actions (or both) will give the base station a better chance of properly receiving the phone's transmissions. The '174 Patent notes that for EDCH messages (a particular type of message discussed in the '174 Patent), the data rate of the message cannot be altered during the transmission of the message. *See id.*, 5:26-36, Appx32. Thus, it is important to select the highest possible data rate at the beginning of a message that can be transmitted at a power level that leaves room to be increased during the transmission of the message. If a message fails to be properly received, the radio resources used to transmit the failed message will have been wasted. *Id.*, 6:1-6, Appx32. Stated a different way, it is better to transmit a message at 75% of its maximum data rate than to try to transmit a message at 100% of the maximum data rate, only to have it fail and end up retransmitting it all over again.

The Challenged Claims require determining a difference between two power levels. The first power level is the "total maximum transmit power of the subscriber station for the codes." This is the maximum power level at which the phone can transmit information to the base station using the codes it has been assigned. *See, e.g.*, *id.*, Claim 1, Appx34.

The second power level to be determined is "a total transmit power of the subscriber station for the codes at a start of a message transmission using a first

one of the codes." This power level is the power level that is used at the start of a message. *Id.* Notably, the phone determines the second power level at a specific instant of time. The '174 Patent states that:

> The second of the two transmit powers is the total transmit power of the subscriber station for the plurality of codes at the start of a message transmission using a first of the codes. This corresponds to the sum of the transmit power for the first code and the transmit power for the remaining code or codes, and moreover in each case at the time of the start of the message transmission using the first code.

*Id.*, 2:59-65 (emphasis added). Thus, the time the power level of all of the codes is to be taken into account is at the start of the transmission of a message using a first code.

### D. <u>Overview of Baker</u>

Baker addresses a situation where a phone is transmitting using two codes at maximum (or near maximum) power and has to make room for the transmission of another signal using a third code. Specifically, the problem discussed in Baker is how to transmit an ACK/NACK signal on the HS-PDCCH (High-Speed Dedicated Physical Control Channel), while at the same time, also transmitting on the DPCCH (Dedicated Physical Data Channel) and DPDCH (Dedicated Physical Control Channel). Baker, Abstract, Appx909. The ACK/NACK signal as well as the information on the DPCCH and DPDCH must be transmitted without exceeding some maximum level associated with the phone. *See id.*, ¶24, Appx914; Dinan Dec. ¶¶60-67, Appx2144-2148. The ACK/NACK signal on the HS-PDCCH as well as the information on the DPCCH and DPDCH are each

transmitted using a separate CDMA spreading code. ACK/NACK signals are typically short in duration, lasting only a few time slots. *See, e.g.*, Baker Fig. 4, Appx911. On the other hand, transmissions on the DPCCH and DPDCH can last for 10, 20, 40, or 80 milliseconds, which translates into 15 to 120 time slots, or 8 frames. Dinan Dec. at ¶66, Appx2147.

Baker achieves these objectives by "turning down the volume" on the DPCCH and DPDCH immediately prior to transmitting an ACK/NACK signal on HS-DPCCH. Dinan Dec. ¶67, Appx2148. This is illustrated in Fig. 4 of Baker, reproduced below:




FIG. 4

Baker, Fig. 4, Appx911 (annotated - where the vertical axis is the power level of the transmission and the horizontal axis is time). The DPCCH and DPDCH are transmitted in time slots and the power associated with these channels can only be adjusted at time slot boundaries. Baker at ¶4, Appx913. Data on the HS-PDCCH is also transmitted in time slots, but these time slots are not synchronized to the same clock as the DPCCH and DPDCH time slots (*i.e.*, the time slots of the HS-

PDCCH and the DPCCH/DPDCH are not aligned). *Id.* at ¶25, Appx914. The HS-PDCCH is part of an improvement to UMTS, known as HSPA (High Speed Packet Access). HSPA allowed for data to be transmitted and received at higher rates than originally contemplated in UMTS. Dinan Dec. ¶67, Appx2148.




FIG. 4

Baker's solution to this set of circumstances is to reduce the power of the UMTS transmissions (the signals on the DPCCH and DPDCH) at the beginning of a UMTS timeslot if it has been determined that an ACK/NACK signal will be transmitted on the HS-PDCCH and such transmission will commence before the transmission of the UMTS signals in a particular time slot concludes. Baker at ¶ 27, Appx914. The purpose of this reduction in power is to keep the total transmission power of the UMTS and HS-PDCCH signals within the total power budget of the transmitting device.

This is what is shown in Baker's Fig. 4 (see below). At Time 1, the phone knows that: 1) its transmissions of UMTS signals are at or near the maximum power level in the preceding slot; 2) that it will have to transmit an ACK/NACK

signal during the current UMTS time slot; and 3) that the current transmit power level of the signals being transmitted by the phone on the DPCCH and DPDCH (referred to as $P_C$ and $P_D$, respectively, in Figs. 3 and 4 of Baker – *see id.* at ¶28, Appx914) plus the ACK/NACK signal will exceed the power limits of the phone. Based on this information, Baker decreases the $P_C$ and $P_D$ to accommodate the upcoming ACK/NACK signal transmission. At Time 2, the transmission of the ACK/NACK signal commences at some power level that, combined with $P_C$ and $P_D$, is at or below the maximum level of the phone. At Time 3, the transmission of the ACK/NACK signal completes, leaving some unused power. At Time 4, $P_C$ and $P_D$ are increased back to the level at which they were prior to the transmission of the ACK/NACK signal.



FIG. 4

*Id.*, Fig. 4 (annotated), Appx911.

Important to this appeal is the timing of the ACK/NACK signal relative to the time slots used by the DPCCH and DPDCH. In Baker, the timing of a transmission of an ACK/NACK signal and transmissions on the DPCCH and

DPDCH are not related. Dinan Dec. at ¶66, Appx2147. Thus, Baker may be required to reduce the power used to transmit on the DPCCH and DPDCH in order to accommodate transmitting an ACK/NACK signal at any time during the transmissions on the DPCCH and DPDCH. *Id.* In Baker, the power may be reduced in the beginning, middle, or end a transmission on the DPCCH and DPDCH. For example, assuming an 80 millisecond transmission on the DPCCH/DPCCH, the power reduction could occur at any one of the 120 time slots in the transmission. *Id.*

### E. <u>Overview of Reed</u>

Unlike Baker, Reed actually contemplates power headroom. As explained by Reed in the Background of the Disclosure:

> Headroom is the difference between the maximum power of the transmitter and the transmission power level required for a particular data rate. When a mobile station would like to establish a communication channel and has data in its buffer, the mobile station determines its maximum transmission power, subtracts the headroom, and uses the remaining available transmit power to determine a maximum data rate. Thus, the maximum data rate has margin built in to provide some protection against varying channel conditions.

Reed, 1:29-37, Appx905. Of note in this portion of Reed – actual transmit power is calculated by subtracting headroom from the phone's maximum power.

Reed improves on the prior art by calculating a more accurate headroom value. *Id.*, 1:54-57, Appx905. As shown in Figs. 2 and 3 of Reed (and the corresponding discussion in the specification), there are a number of variables that

Reed considers in calculating the headroom to be used in a transmission. *Id.*, Figs. 2 and 3, Appx903-904. According to Reed, consideration of these other variables can lead to the determination of a more accurate headroom value. *Id.*, 2:61 and 5:41-47, Appx905 and Appx907.

Reed also discloses that data can be sent on two or more data streams. *Id.*, 4:14-21, Appx906. The nature of these data streams is not described, however, and one is left to contemplate whether they are realized by assigning different codes to the data streams or by multiplexing these streams on to a single code channel. Reed goes on to describe that each of these streams can have its own headroom and that the headrooms associated with each stream can be adjusted independently. *Id.*, 4:14-21, Appx906.

### F. <u>The PTAB Proceeding</u>

HTC discusses the prior proceedings in its Opening Brief. *See generally*, Appellants' Opening Brief at 21-31. Rather than re-summarize the various events that transpired in the IPR proceeding, the following discussion will focus on a particular aspect of the IPR proceedings that is at issue here: the construction of the term "message."

HTC states that CCE "offered several proposed constructions of the term 'message' at the Oral Hearing, none of which had been previously disclosed to Appellants or the Board." Appellants' Opening Brief at 27. What HTC fails to

disclose, however, is that CCE's responses as to the meaning of the term "message" were provided in response to direct questions from the Board. *See* Appellants' Opening Brief at 27-8 (table listing CCE's "constructions" of the term "message"). Specifically, the statements listed in the table on pages 27-8 of Appellants' Opening Brief were all preceded by Judge Bisk asking CCE's counsel, "What is a message?" Oral Hearing at 31:15, Appx716. In fact, this was the first question asked of CCE's counsel at the Hearing. Other questions from the Board followed about what is and is not a message, and whether Baker discloses a message:

> JUDGE WEINSCHENK: Does a single frame, as disclosed in Baker, meet that definition of message? *Id*. at 32:6-7, Appx717;
>
> JUDGE ANDERSON: -- the transmission of this acknowledged, no knowledge, ACK and NACK, whatever that is, is not a transmission of information that would be construed by us in the message? *Id*. at 34:1-4, Appx719;
>
> JUDGE WEINSCHENK: Other than -- other than a lack of evidence or disclosure in -- in Baker, do we have any evidence in the record that says a timeslot or a frame is not a message? *Id*. at 36:6-9, Appx721;
>
> JUDGE WEINSCHENK: But don't . . . individual timeslots and frames have a beginning and an end? . . . . Why is that not a message? *Id*. at 37:10-6, Appx722; and
>
> JUDGE WEINSCHENK: And, I guess, the thing that I'm having some difficulty with is -- I understand your position that a message has a beginning and end, but how do we figure out when something is a message and not a message? *Id*. at 38:12-6, Appx723.

Additional questions like the ones above followed from the Board. Thus, from the outset of CCE's time with the Board at the Oral Hearing, it was the Board, not CCE, that initiated the discussion regarding the term "message." In light of the foregoing, the quotations from CCE contained in HTC's Opening Brief on pages 27-28 are properly viewed as responses to question from the Board, rather than affirmative "constructions" regarding the term "message."

This point is emphasized later when Judge Bisk asked CCE:

> So . . . I just want to ask . . . what you think. Is this a claim construction issue we're discussing or is this a[n] anticipation analysis issue?

*Id.* at 40:4-7, Appx775. To which CCE responded:

> I think it's an anticipation analysis, Your Honor, . . . neither side has asked that message be construed . . . so to start there. But it's their [HTC's] burden to show that something is approaching a message, and I don't think they have. All they've pointed to is an arbitrary timeslot in their petition, and they later come back in their reply and start talking about frames now, which wasn't in their original petition. But . . . there's nothing in the record . . . that says the beginning of a particular timeslot is a message. It's just not there. And so I . . . would a construction of message maybe be helpful? You know, yes, if we all agreed as to what a message was. I think under any reasonable construction of what a message is, under the broadest reasonable construction of a message -- just picking an arbitrary point in a data stream doesn't get you there.

*Id.* at 40:8-41:6, Appx725-726. Again, contrary to the picture painted by HTC, CCE framed its comments as going to HTC's claims that Baker anticipated the '174 Patent, rather than what the proper construction of "message" was.

It is further worth noting that HTC had multiple opportunities to advance its own construction of "message." Of course, it could have proposed a construction in its Petition – but did not. *See* Petition at 9-12, Appx260-263 (listing the terms HTC believed required construction, but not including "message"). Even after being put on notice of CCE's arguments regarding Baker's lack of disclosure of a message, it failed to raise the issue of construing "message" in its Reply. Finally, at the Oral Hearing, HTC again failed to address the issue:

> JUDGE BISK: You need -- you need to construe the term message?
>
> MR. HADDEN [HTC's counsel]: I don't think so, Your Honor. I mean, it's data that's being transmitted by the device, and that's the only instance in which it's certainly described in the '174 patent. No higher concept of message.

Oral Hearing at 13:8-20, Appx698. In this exchange, HTC affirmatively stated that the term "message" did not need to be construed.

## STANDARDS OF REVIEW

The Board's ruling that HTC's argument "that the term 'message transmission' in the challenged claims refers to any frame in a message" was improperly presented by HTC is reviewed for an abuse of discretion. *See* Final Written Decision at 12, n. 4, Appx12 (the Board's ruling) and *Star Fruits S.N.C. v. United States*, 393 F.3d 1277, 1281 (Fed. Cir. 2005).

With respect to HTC's allegation that the Board misconstrued the term "message", CCE's position is that the Board simply applied the ordinary meaning

of that term as part of determining that the Challenged Claims are patentable over the cited references. As such, CCE believes that the proper standard of review of that term is the substantial evidence one. *See, e.g., Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015) ("Anticipation . . . is a question of fact . . . [w]e review the Board's factual findings for substantial evidence.").

To the extent the Board was found to construe the term "message", that construction is reviewed under the "substantial evidence" standard since the Board considered and cited to extrinsic evidence regarding the term. *See, e.g.*, Final Written Decision at 11-2, Appx11-12 ("Patent Owner identifies evidence indicating that a message transmission may include multiple frames and timeslots. *Id.*; Ex. 1015 ¶ 11; Ex. 2022 ¶ 87." – Ex. 2022 is CCE's Expert's Declaration).

Legal determinations made in an obviousness analysis are reviewed *de novo*, while underlying factual determinations are reviewed for substantial evidence. *Rambus Inc. v. Rea*, 731 F.3d 1248, 1251 (Fed. Cir. 2013).

## **SUMMARY OF THE ARGUMENT**

The Board's decision that the Challenged Claims are patentable should be upheld for at least the following reasons:

First, HTC's argument that Baker anticipates the Challenged Claims based on its contention that a message can be a single frame is improper because it was

not included in the Petition. Since the filing of its Petition, HTC has improperly presented this argument in its Reply, at the Oral Hearing, and in its Opening Brief. The Board, in its Final Written Decision, recognized the impropriety of this argument and rejected it. This Court should as well.

Second, Baker fails to anticipate the Challenged Claims because there is no disclosure of "messages" in Baker. Since there is no disclosure of "messages" in general, there can be no disclosure of "determining a transmit power difference . . . at a start of a *message* transmission" as required by all of the Challenged Claims. Instead of identifying a message, HTC identifies an arbitrary time slot that precedes an ACK/NACK signal. Thus, the "message" identified by HTC is simply the point in time before an ACK/NACK signal. CCE pointed out that HTC has come forward with no evidence that this arbitrary time slot is the "start of a message transmission." The Board, after considering hundreds of pages of evidence, came to the same conclusion.

On a related note, HTC's arguments regarding the construction of the term "message" are not sound. The Board did not construe the term "message" and HTC affirmatively stated as late as the Oral Hearing that the term did not need to be construed. Rather, the Board applied the ordinary meaning of the term and, as such, rejected HTC's position that an arbitrary time slot corresponds to the message limitation in the Challenged Claims.

Third, with respect to HTC's allegations that the combination of Reed and Baker, or Reed and Love, suggests the Challenged Claims, HTC and CCE have opposite views of a key paragraph in Reed that relates to the headroom of two data streams. The Board, in weighing the parties' competing views, found that HTC took positions inconsistent with the express disclosure of Reed and that HTC's expert took opposing and inconsistent positions in the portions of his declarations regarding Reed. Ultimately, the Board found that CCE had the better position and found in its favor.

For these reasons, the Board's determinations should be upheld.

## ARGUMENT

### A. HTC's "Entire Argument" Regarding Baker Was Improper

At the Hearing, HTC confirmed that its "entire argument" regarding how Baker anticipated the Challenged Claims was "based on a message being a single frame."

> JUDGE WEINSCHENK: So this -- just so I understand, is your entire argument that it starts at the beginning of a message in Baker based on a message being a single frame?
>
> MR. HADDEN [HTC's Counsel]: Yes.
>
> JUDGE WEINSCHENK: Okay.

Oral Hearing at 13:8-20, Appx698. The problem for HTC, however, is that this argument is not contained in its Petition, a fact that the Board recognized. Regarding this "argument", the Board found that:

> Petitioner argued at the oral hearing that the term "message transmission" in the challenged claims refers to any frame in a message because the EDCH message described in the '174 patent can be a single frame. Tr. 61:2–62:10. Petitioner's argument is improper because it was presented for the first time at the oral hearing. *See* Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,768 (Aug. 14, 2012).

Final Written Decision at 12, n. 4, Appx772. Thus, what HTC acknowledged at being "its entire argument" was not timely presented and properly rejected. Despite the Board's finding, HTC continues to present this argument in its Opening Brief. *See, e.g.,* Appellants' Opening Brief at 32 ("The preferred embodiment of the '174 Patent indicates the relevant "message" for determining when a power transmit difference should be determined lasts <u>one frame</u> and is, hence, transmitted at <u>frame boundaries</u> in a UMTS system. Baker clearly teaches transmitting data at <u>frame boundaries</u>. Thus, Baker discloses "start of a message transmission" limitation and anticipates the Challenged Claims of the '174 Patent.") (emphasis added). To the extent found in HTC's Opening Brief, these arguments should be disregarded since they were not included in HTC's Petition.

### B. Baker Fails to Disclose the Claimed Inventions

Baker does not disclose the invention described by the Challenged Claims because it does not describe determining headroom at the beginning of a message. As mentioned above, the term "message" is not found in Baker. Instead, Baker describes lowering the power of an ongoing transmission at the beginning of a time slot prior to transmitting an ACK/NACK signal. The only significance of the time slot at which the power is lowered is that it is the time slot prior to the transmission of the ACK/NACK signal. Baker does not describe this time slot as being at the beginning of a message.

As pointed out by HTC, Baker describes lowering the power at both time slot boundaries and frame boundaries. *See, e.g.*, Appellants' Opening Brief at 42. But, this is hardly the revelation that HTC makes it out to be, for as discussed above, since every frame is made up of 15 time slots, every 15th time slot boundary will also be a frame boundary. As shown in Fig. 4 of Baker, a time slot/frame boundary is nothing more than a specific point in time. Baker's disclosure that power adjustments can happen on frame boundaries is simply noting that, in addition to the possibility that an adjustment can at every time slot boundary (every 666 microseconds), it can also happen at the time slot boundaries that also happen to be frame boundaries.

As an initial point, Baker doesn't disclose messages of any kind. For instance, it never characterizes transmissions on the DPCCH or DPDCH as messages. Further, HTC, in its Petition, never characterizes these transmissions as messages. The best reading of HTC's Petition on this point is that it believes that any single time slot is a message. *See* Petition at 24-6, Appx275-277 ("Accordingly, Baker discloses that the mobile station maintains the transmit power difference at a start of a message transmission (i.e., transmission time slot) using a first one of the codes." (p. 26, Appx277)). Thus, because Baker never characterizes any particular point in time as the "start of a message transmission", Baker does not anticipate the Challenged Claims.

Furthermore, because Baker adjusts power at the beginning of arbitrary time slots and messages in the '174 Patent may start at time slot boundaries is a factor considered by the Board and was found to still not be enough. To illustrate Baker's failure to disclose adjusting power levels at the beginning of a message, consider a single transmission on Baker's DPCCH or DPDCH can span 80 milliseconds. *See* Dinan Dec., ¶ 66, Appx2147. In an 80 millisecond transmission, Baker's phone will be transmitting for 120 consecutive time slots, which is equal to 8 frames. Assuming the ACK/NACK signal shown in Fig. 4 is to be transmitted at an arbitrary time during this transmission, there is a 1 in 120 chance that the power of Baker's DPCCH/DPDCH transmissions will be reduced at the start of the

transmission, since only one time slot of the 120 slots in the transmission will be the first time slot. Since only one time slot can be the time slot at the beginning of the transmission, there is a 119 in 120 chance the power adjustment alleged by HTC to correspond to the claimed "at a start of a message transmission" will not be at the beginning of the transmission found in Baker.

The Board recognized these facts in coming to its decision that Baker does not anticipate the Challenged Claims of the '174 Patent. First, the Board agreed with CCE's factual characterization of Baker:

> Patent Owner argues that Petitioner has not shown sufficiently that the boundary of the frame or timeslot immediately preceding the ACK or NACK signal in Baker is the start of a message transmission. PO Resp. 35–36. Specifically, Patent Owner identifies evidence indicating that a message transmission may include multiple frames and timeslots. Id.; Ex. 1015 ¶ 11; Ex. 2022 ¶ 87. Thus, according to Patent Owner, the boundary of the frame or timeslot immediately preceding the ACK or NACK signal in Baker is not necessarily the start of a message transmission. PO Resp. 35–36; Ex. 2022 ¶¶ 85–87. <u>We agree with Patent Owner.</u>
> . . .
> Petitioner does not identify any express disclosure in Baker indicating that the boundary of the frame or timeslot immediately preceding the ACK or NACK signal is the start of a message transmission. Pet. 23–26; Pet. Reply 9–10; Tr. 11:3–10.
> . . .
> Petitioner does not argue or identify evidence indicating that the mobile station in Baker transmits an EDCH message. Id. at 9–10; Tr. 12:6–16.

Final Written Decision, pp. 11-2, Appx11-12 (emphasis added). In this portion of the Final Written Opinion, the Board specifically found that 1) Baker does not

disclose EDCH messages, 2) Baker does not disclose that the boundary of the frame or time slot preceding the ACK/NACK signal is the start of a message, and 3) that messages can span over multiple time slots and frames. Based on these facts, the Board concluded that Baker does not disclose the "determining . . . at a start of a message transmission" portion of the Challenged Claims.

The Board then turned to whether Baker *inherently* disclosed "determining . . . at a start of a message transmission" and concluded it did not. The Board noted that for a reference to inherently disclose a claimed invention, it must necessarily include the inherent claim element, which is in accord with Federal Circuit law on this issue. *See In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999) (cited by the Board - "Inherency . . . may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient.") Specifically, the Board stated:

> Petitioner argues that an EDCH message can be a single frame, and, thus, the start of a frame of an EDCH message can be the start of a message transmission. Id. at 9; Ex. 1015 ¶ 11. However, the mere possibility that the start of a frame may correspond to the start of a message transmission is not sufficient to show that Baker anticipates the challenged claims. *See In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999) ("Inherency . . . may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient."). Further, Petitioner acknowledges that a message transmission in Baker may include more than one frame, and, as a result, the start of a frame in Baker does not necessarily correspond to the start of a message transmission. Tr. 12:6–16, 16:19–19:13.

Final Written Decision at 13, Appx13. The example above involving Baker's 80 millisecond transmission drives this point home. Out of the 120 timeslots in such a transmission, only one will be at the beginning of the transmission in Baker. Importantly, however, Baker does not assign any significance to adjusting its transmit power at this first time slot.

### C. HTC's Arguments Are Not Persuasive

Setting aside HTC's claim construction complaints, which will be addressed below, HTC first argues that because Baker discloses adjusting the power of its transmissions at the beginning of a frame boundary, and because a message within the context of the '174 Patent can also start at a frame boundary, Baker discloses this aspect of the Challenged Claims (noting, however, this argument is improper because it wasn't present in the Petition – *see* Arguments, Section A, above). As discussed in more detail above, Baker's real disclosure is that its power adjustments can happen at the beginning of *any* time slot, including time slots that also happen to be at the beginning of a frame. But, HTC ignores the fact that some/most frame boundaries are not the beginning of messages and that Baker has no disclosure of messages generally. The Board fully took these facts into account when it decided that "because Petitioner has not shown that Baker expressly or inherently discloses determining a transmit power difference between a maximum transmit power for the codes and a total transmit power for the codes *at a start of a*

*message transmission* using a first one of the codes, Petitioner has not shown by a preponderance of the evidence that Baker anticipates claims 1, 6, 9, 14, 18, and 19 [of the '174 Patent]". Final Written Decision at 13, Appx13 (emphasis in original). As noted in the Final Written Decision, this conclusion is based more than mere "substantial evidence." The Board considered Baker and the declarations of both CCE and HTC's experts in coming to its conclusion. *See* Final Written Decision at 11-3, Appx11-13.

**D. <u>Construction of Message</u>**

HTC spends much time presenting its views on how the Board misconstrued the term "message." *See generally* Appellants' Opening Brief at 34-43. These views are inaccurate, however, as the Board did not construe the term "message." As discussed above, it is undisputed that neither party asked the Board to construe the term "message" and that the Board did not, in fact, construe the term. *See* Final Written Decision at 8-10, Appx8-10 (listing the terms construed and their constructions, but not including the term "message").

For the Board to arrive at its conclusion, all that it had to do in the way of the term "message" was to apply the ordinary meaning of the term in such a way that excluded single arbitrary time slots. This assertion is the natural consequence of what HTC stated in its Petition. In that document, the only portion of Baker that HTC identified as corresponding with the "message" limitation in the Challenged

Claims was a time slot. The relevant portion of HTC's Petition is presented below to emphasize this point:

> Further, in Baker, the mobile station maintains the power transmit difference *at a start of a message transmission using a first one of the codes*. (*See* Decl. ¶ 102, Ex. 1003.) Baker discloses that DPDCH and DPCCH codes are formatted into **"time slots whose duration is specified by the system."** (Baker [0023], Ex. 1005; *see also* Decl. ¶¶ 99, 102, Ex. 1003.) Baker then discloses that the mobile station reduces the transmit power of the DPDCH and DPCCH codes **"at the time slot prior to the start of the ACK/NACK transmission."** (Baker [0027], Ex. 1005; *see also* Decl. ¶ 102, Ex. 1003.) Figure 4 illustrates this. In Figure 4, the transmit power of DPDCH and DPCCH codes (PC and PD) is reduced to PC2 and PD2 at **the time slot for these codes immediately preceding the ACK/NACK transmission**. (*See* Decl. ¶ 102, Ex. 1003.) The following annotation illustrates this notion:




FIG. 4

> Accordingly, Baker discloses that the mobile station maintains the transmit power difference at **a start of a message transmission (*i.e.*, transmission time slot)** using a first one of the codes.

Petition at 25-6, Appx276-277 (italics in original, bold and underlining added). Reading this section of the Petition in context, HTC repeatedly identifies the time

slot prior to the start of the transmission of the ACK/NACK signal as corresponding to the "message" recited in the Challenged Claims. CCE responded that a time slot is not a "message" and that Petitioner had no evidence to support this assertion:

> Baker further does not disclose determining the transmit power . . . at the start of a message. In fact, the word "message" is not found in Baker. What Petitioner has done is to pick **an arbitrary time slot** in Baker and designate that as "the start of a message." But, there is no factual support in Baker or Petitioner's Expert's Report to deem the point in time . . . as the start of some message.

Patent Owner Response at 35, Appx502 (emphasis added). With this understanding, the Board could have arrived at its conclusion if it determined that Baker's time slots did not correspond to the '174 Patent's "message" element. HTC goes on at length about what are messages in the '174 Patent. But, the fatal flaw in HTC's Petition, which was the recognized by the Board, is that the alleged "message" in Baker is not a "message." From that flows the Board's finding that there is no disclosure in Baker that "the boundary of the frame or timeslot immediately preceding the ACK or NACK signal is the start of a message."

### E. Reed

In its Petition, HTC claimed that Reed disclosed subject matter described in the Challenged Claims, except for the fact that it did not disclose using a "plurality of codes." Petition at 29, Appx280 ("Reed does not explicitly disclose that a mobile station can be assigned a plurality of codes".) But, according to HTC, Reed

discloses that a phone could transmit two or more data streams at the same time. *Id.* HTC then argues, that since Baker (or Love) discloses the use of multiple codes, and that one of ordinary skill would know that the separate data streams in Reed could be transmitted using different codes as described in Baker (or Love). HTC alleges that this suggests the Challenged Claims. *See Id.*, at 27-30, Appx278-281.

In its Response, CCE disputed HTC's allegations regarding Reed. CCE argued that if one followed the teachings of Reed, the headrooms of the two data streams in Reed would be managed independently. In other words, Reed taught that each data stream would have its own headroom. CCE stated that determining and managing headroom for streams individually went against the teachings of the '174 Patent and the Challenged Claims, which require that headroom be determined by the difference between the phone's maximum power and *all* of the codes. *See* Patent Owner Response at 36-41, Appx503-508.

The Board agreed with CCE and its reasoning. The Board stated that "the portions of Reed cited by Petitioner [Reed, 4:14-21, also cited by CCE and the Board in their respective papers] do not demonstrate that there is a single headroom for the entire device when the mobile station transmits two or more data streams." Final Written Decision at 18, Appx18. The Board found:

> This portion of Reed indicates that the headroom for one data stream can be adjusted independently of the headroom for the other data

> streams, and, thus, demonstrates that each data stream has its own headroom. *Id.*; Ex. 1003 ¶ 110; Ex. 2022 ¶¶ 100–101. As a result, assuming that each data stream in Reed is assigned a different code, Reed teaches determining a separate headroom for each code, not determining a single headroom for a plurality of codes. Ex. 1003 ¶ 110; Ex. 2022 ¶¶ 101–104.

*Id.* at 16, Appx16. The Board also took issue with statements made by Petitioner at the Hearing (finding them inconsistent with the record) and determined that Petitioner's expert changed his story about what Reed showed in the way of separate data streams having their own headroom. *See id.* at 18, Appx18 ("Petitioner acknowledged at the oral hearing that this argument is premised on an assumption that the headroom in Reed is fixed. Tr. 25:1–27:12. That assumption is inconsistent with the express teaching in Reed that the headroom can be increased. Ex. 1004, col. 4, ll. 9–21.) and *id.* at 17, Appx17 ("Because the statements in Dr. Williams' second declaration cited by Petitioner are inconsistent with Dr. Williams' first declaration, we determine that those statements lack credibility and we afford them little weight.").

In its Opening Brief, HTC takes issues with the factual findings of the Board, as discussed above. HTC sums up its argument by stating "it is simply incorrect and unsupported by substantial evidence to conclude that Reed discloses anything other than determining power headroom based on available transmit power of the entire mobile device – and not calculating individual headrooms for separate data streams." Appellants' Opening Brief at 50. But, contrary to this

assertion, Reed explicitly discloses calculating headrooms for separate data streams. In the paragraph of interest (Reed, 4:14-21), Reed discloses that the "headroom on one of the data streams" can be altered. Reed, 4:16-8, Appx906. Since each stream has its own headroom, it follows that each stream has been assigned a maximum transmit power. A simple example makes this point. Assume a phone has a maximum transmit power of 20W and can transmit on two data streams, and each stream was allocated 10W. In this example, each stream could transmit up to 10W, but no more, because the other 10W of power available to the phone as a whole is allocated to the other stream. According to HTC's incorrect interpretation, the maximum transmit power of the phone, 20W, would be the ceiling of each stream's headroom. In this situation, if each stream believed it could transmit at 20W, there would be instances where the sum of the transmit power of the two streams could exceed 20W, a physical impossibility, in this example. On the other hand, according to the position set forth by CCE and accepted by the Board, Reed's disclosure that each stream has its own headroom means that a maximum transmit value is assigned to each stream, as part of defining that stream's headroom. Stated differently, the disclosure of each stream having its own headroom necessitates each stream having its own maximum transmit value.

Regardless of the parties competing arguments, the Board thoroughly explored this precise issue and discussed it extensively in its Written Opinion. *See* Final Written Opinion at 14-9, Appx14-19. As such, as documented in the Written Opinion, the Board's decision that neither the combination of Reed with Baker or Love suggests the Challenged Claims rests upon ample evidence and is the correct one.

## **CONCLUSION**

HTC and ZTE have not carried their burden in showing that the Board's decision is not supported by substantial evidence. As to Baker, Appellants, perhaps strategically, anchor their attack on the non-existent construction of the term "message." Despite having several opportunities to set forth a construction of the term "message", Appellants failed to do so. Appellants' complaints are really about the application of the ordinary meaning of the term "message", not about its construction. In reality, the Board properly applied the term "message" and determined that Baker did not anticipate the Challenged Claims. With respect to Reed, HTC and ZTE, on the one hand, and the Board and CCE, on the other, simply take away different meanings from the same paragraph in Reed. In seeking the proper determination as to the substance of the disclosure in Reed, the Board studied Reed, as well as other evidence before them. After careful consideration of this evidence, it determined that the combination of Reed with Baker or Love, did

not suggest the Challenged Claims. The Board's factual findings behind this determination are sound and should be left undisturbed.

November 28, 2016

Respectfully submitted,

*/s/ Barry J. Bumgardner*__________
Barry J. Bumgardner
barry@nelbum.com
John P. Murphy
murphy@nelbum.com
**NELSON BUMGARDNER, P.C.**
3131 W. 7th Street, Suite 300
Fort Worth, Texas 76107
[Tel.] (817) 377-9111
[Fax] (817) 377-3485

***Counsel for Appellee Cellular Communications Equipment, LLC***

**CERTIFICATE OF SERVICE**

I certify that on November 28, 2016, I electronically filed the foregoing using the Court's CM/ECF filing system. Counsel was served via CM/ECF which constitutes service, pursuant to Fed. R. App. P. 25(c)(2), Fed. Cir. R. 25(a), and the Court's Administrative Order Regarding Electronic Case Filing 6(A) (May 17, 2012).

November 28, 2016

*/s/Barry J. Bumgardner*
Barry J. Bumgardner

***Counsel for Appellee Cellular Communications Equipment, LLC***

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, I hereby certify that I am an attorney of record on behalf of Appellee Cellular Communications Equipment LLC and that I personally used the "word count" feature of Microsoft Word 2010 to count the words in the foregoing Brief of Appellee Cellular Communications Equipment LLC identified in the Rule 32(a)(7)(B)(iii) and determined that the foregoing brief contains 8,671 words and is therefore in compliance with Rule 32(a)(7)(B)(i).

In addition, this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman.

November 28, 2016

*/s/Barry J. Bumgardner*
Barry J. Bumgardner

***Counsel for Appellee Cellular Communications Equipment, LLC***