**No. 16-1880**

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

HTC CORPORATION, ZTE (USA), INC.,
*Appellants,*

v.

CELLULAR COMMUNICATIONS EQUIPMENT, LLC,

*Appellee.*

On Appeal from the United States Patent & Trademark Office
Patent Trial and Appeal Board No. IPR2014-01134

# APPELLANTS HTC CORPORATION AND ZTE (USA), INC.'S REPLY BRIEF

Steven A. Moore
Matthew R. Stephens
Pillsbury Winthrop Shaw Pittman LLP
501 W. Broadway, Suite 1100
San Diego, CA 92101
(619) 234-5000

*Counsel for HTC Corporation and ZTE (USA), Inc.*

# TABLE OF CONTENTS

**Page**

ARGUMENT ..... 2

I. Appellants' Arguments Directed to the "At a Start of a Message Transmission" Were Properly Considered by the Board ..... 2

II. The Board Failed to Properly Construe "At a Start of a Message Transmission" ..... 5

1. The Board Failed to Distinguish Between "at a Start of a Message Transmission" and "Message" ..... 6

2. The Broadest Reasonable Interpretation of "at a Start of a Message Transmission" Should Encompass Data Transmission at Time Intervals Specified in a UMTS System ..... 7

III. CCE Concedes Baker Discloses "Messages" ..... 10

IV. Baker Discloses Determining Power Headroom At The Start of a Frame ..... 13

V. Baker Anticipates Regardless of Construction of "at a Start of a Message Transmission" ..... 15

VI. Reed Discloses Determining Power Headroom For A Plurality of Codes ..... 18

CONCLUSION ..... 21

# TABLE OF AUTHORITIES

**Page**

## Cases

*Dell Inc. v. Acceleron, LLC*,
818 F.3d 1293 (Fed. Cir. 2016)....................5

*In re Watts*,
354 F.3d 1362 (Fed. Cir. 2004)....................3

*Redline Detection, LLC v. Star Envirotech, Inc.*,
811 F.3d 435 (Fed. Cir. 2015)....................3

## Rules and Regulations

Federal Circuit Rules
Rule 47.4....................1

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, Steven A. Moore certifies the following:

1. The full name of the parties represented by me is:

   HTC Corporation and ZTE (USA), Inc.

2. The name of the real party-in-interest (if the party named in the caption is not the real party-in-interest) represented by me is:

   Not applicable.

3. All parent corporations or any publicly held corporations that own 10% or more of the stock of HTC Corporation or ZTE (USA), Inc.:

   HTC Corporation has no parent corporation, and there is no publicly-held corporation that owns 10% or more of HTC Corporation's stock.

   ZTE (USA), Inc. is a wholly-owned subsidiary of ZTE Corporation, which is a publicly-traded corporation.

4. The names of all law firms and the partners or associates that appeared for the party now represented by me in this proceeding are:

   Richard W. Thill

/s/ *Steven A. Moore*

January 11, 2017 Steven A. Moore

## ARGUMENT

The Board's Final Written Decision cannot stand. First, the Board misinterpreted the phrase "at a start of a message transmission" to exclude transmissions of data at intervals specified in a UMTS system. Moreover, Appellee Cellular Communications Equipment, LLC ("CCE") fails to rebut Appellants' argument that Baker teaches transmitting data at frame boundaries, thereby disclosing the "at a start of a message transmission" limitation recited in the Challenged Claims. Finally, nothing in CCE's Response Brief shows that Reed fails to disclose modifying the headroom of separate data streams based on the mobile device's available transmit power in the aggregate. For these reasons, Appellants submit the Board's Final Written Decision should be reversed.

### I. Appellants' Arguments Directed to the "At a Start of a Message Transmission" Were Properly Considered by the Board

CCE urges this Court to disregard Appellants' arguments concerning the Baker reference because Appellants allegedly raised them for the first time at the oral hearing before the Board. *See* Response Br. at 22-23. Despite CCE and the Board's mischaracterization of Appellants' arguments as "improper," the Board

nonetheless considered them in its Final Written Decision. *See* Appx12 n.4. Appellants' arguments were therefore presented to the PTAB and fall within the "four corners" of the record. *See Redline Detection, LLC v. Star Envirotech, Inc.*, 811 F.3d 435, 451 (Fed. Cir. 2015) (quoting *In re Watts*, 354 F.3d 1362, 1367 (Fed. Cir. 2004)). The Board's analysis of Appellants contentions concerning the Baker reference are accordingly properly considered within the scope of this appeal.

Moreover, the Board's characterization of Appellants' argument regarding the Baker reference and the "at a start of a message transmission" limitation as "improper" is belied by the hearing transcript and Appellants' arguments throughout the IPR. In fact, the exchange just before the portion of the hearing transcript cited by CCE indicates that Appellants remained consistent with their positions in the Petition and Reply:

> JUDGE WEINSCHENK: So it could be -- it could be a completely different message that isn't just a single frame?
> MR. HADDEN: <u>**It could be a message that spans more than one frame**</u>.
>
> JUDGE WEINSCHENK: So if we have an anticipation ground, doesn't it have to expressly disclose or inherently disclose that? Do we have that here?

> MR. HADDEN: Well, I think -- **I think there's an issue of what a message is, but I think, given that it is reducing at the frame boundary, which is at the physical layer of what messages are dividing, I think it's already there**. The extending message has some larger extent as determined in the layer that's not being addressed by Baker or the '174 patent.

Appx697:6-698:14 (emphasis added).

This is consistent with Appellants' argument and evidence in the Petition and Reply. *See* Appx276-277 ("Baker discloses that the mobile station maintains the transmit power difference at a start of a message transmission (*i.e.*, transmission time slot)."); Appx303 ("at the **boundary of the frame or time slot** immediately preceding the sending of an ACK or NACK, these amplitudes are adjusted . . .") (emphasis added); Appx581-582 ("Baker discloses that the transmit power can be determined not only at a timeslot boundary but also at a frame boundary."); Appx1181 at ¶¶ 10-11 ("Baker's disclosure of maintaining transmit power difference at a 'frame-boundary' is equivalent to maintaining a transmit power difference at a start of a message in the '174 patent."). Appellants did not point to a previously-undisclosed theory or "factual assertion introduced into the proceeding only at oral argument" or rely on a new portion of the prior art. *See*

*Dell Inc. v. Acceleron, LLC*, 818 F.3d 1293, 1301 (Fed. Cir. 2016). Appellants therefore disagree that any of their arguments directed to the “at a start of a message transmission” limitation were “improper.”

## II. The Board Failed to Properly Construe “At a Start of a Message Transmission”

Although the Board clarified that the phrase “at a start of a message transmission using a first one of the codes” modifies the phrase “a total transmit power of the subscriber station for the codes” in the Challenged Claims, the Board committed reversible error by failing to properly construe "at a start of a message transmission", which compromised its entire anticipation analysis. The Challenged Claims require determining a transmit power difference (i.e., “power headroom”) "at a start of a message transmission" not simply "at a start of a message.” The Board failed to recognize that the phrase "message transmission" is different from "message." Further, the claim limitation "at a start of a message transmission" refers to a beginning of a transmission time interval for transmitting the message. This claim limitation does not require the identification of what “message” is being transmitted; rather, this limitation requires the identification of the transmission time intervals at which the “message” is transmitted. The

Board also ignored the explicit teaching of the '174 Patent in its anticipation analysis and erred by finding a lack of evidence that the start of a frame of an EDCH message is the start of a message transmission for an EDCH message.

### 1. The Board Failed to Distinguish Between "at a Start of a Message Transmission" and "Message"

The term "message transmission" is directed to a transmission that includes a message. The '174 Patent does not define the term "message", but it does define "message transmission" as a "communication" of information or data between the subscriber station and the base station. *See* Appx31 at 4:30-32 ("In the uplink (UL) direction the communication, i.e. the message transmission from the subscriber station UE to the base station NODE B, ….)

According to CCE's expert, UMTS uses "time division techniques with a time-slot and frame structure" similar to that used in Time Division Multiple Access or TDMA systems. *See* Appx2126-2127 at ¶ 25 (Declaration of CCE's expert, Dr. Esmael Dinan). In the TDMA system, the duration of a time period is divided into a number of non-overlapping intervals and a subscriber station is assigned a time-slot to transmit its information. *See* Appx2123-2124 at ¶19. Thus, in the

UMTS system, a physical channel, consisting of radio frame and time-slots, is the mechanism with which the data are transmitted; and every data transmission begins at a frame boundary or time slot boundary. *See* Appx2127-2128 at ¶ 26. A data transmission may take multiple frames or time slots to transmit, but the time intervals for all data transmissions in the UMTS system occur at a frame boundary or time slot boundary. *Id.*

**2. The Broadest Reasonable Interpretation of "at a Start of a Message Transmission" Should Encompass Data Transmission at Time Intervals Specified in a UMTS System**

The '174 Patent describes determining power headroom in a Universal Mobile Telecommunications System (UMTS) radio communication system with a subscriber station (i.e., mobile station or user equipment) and a base station. *See* Appx31 at 4:26-28 ("FIG. 1 shows a section of a UMTS radio communication system with a subscriber station UE (UE: User Equipment) and a base station NODE B.") In its only disclosed embodiment, the patent discloses the use of two codes in a UMTS system for message transmission, e.g., the Dedicated Channel ("DCH") and the Enhanced Dedicated Uplink Channel ("EDCH"). *See* Appx31 at 4:26-28. The '174 Patent describes

that message transmission for the EDCH message begins at specific time intervals called Transmission Time Intervals ("TTI") and defines the transmission time interval (i.e., the length) of an EDCH message to be 10 milliseconds. *See* Appx31 at 4:41-46; *see also* Appx32 at 5:29-30 ("The length of an EDCH message (TTI: Transmission Time Interval) is 10 ms."]. In UMTS communication systems, the length of a frame is 10 milliseconds. *See* Response Br. at 6 ("In UMTS, groups of 15 time slots are referred to as frames. *Id.* A frame lasts 10 milliseconds (15 x 666microseconds –there are 100 frames in one second)."); *see also* Appx1181-1182 at ¶ 11 ("A UMTS frame is 10ms long …."); Appx2126-2127 at ¶ 25. So, the '174 Patent expressly defines the transmission time interval and the length of an EDCH message to be a frame, which is 10 milliseconds. CCE concedes that an EDCH message begins at the start of a frame. Appx698 at 35:16-18 ("'174 patent does describe an EDCH message beginning at the start of a frame. **<u>So an EDCH message begins at the start of a frame</u>**. That's in our patent.") (emphasis added). And because an EDCH message is transmitted at specific time intervals, the '174 Patent specifies that the start of the frame for an EDCH message corresponds to the start of the message

transmission for an EDCH message. *See* Appx31 at 3:5-8 ("If messages are transmitted using the first code at specific time intervals rather than continuously, the start of a time interval of this kind corresponds to the start of the message transmission using the first code."). Despite the overwhelming evidence in the record, the Board erred by finding a lack of evidence indicating that the start of a frame of an EDCH message is the start of a message transmission. Appx13.

Because the '174 Patent specifies that the start of the frame for an EDCH message corresponds to the start of the message transmission for an EDCH message, the broadest reasonable interpretation of "at a start of a message transmission" should encompass transmissions of data at time intervals specified in a UMTS system, such as at the start of a frame or a time slot. So, when an EDCH message is transmitted, which only occurs at specific time intervals of 10 milliseconds (i.e., a frame) and lasts for a single frame, "at a start of the message transmission" for the EDCH message occurs at the start of each frame in the message transmission.

## III. CCE Concedes Baker Discloses "Messages"

The Board's anticipation analysis for Baker centers on CCE's argument that Baker does not disclose "messages." As CCE pointed out, "[the Board] found that Baker simply does not disclose messages of any form. Since Baker does not disclose messages at all, the Board's findings are not surprising and are correct." Response Br. at 4. The Board committed reversible error by disregarding CCE's concession that Baker discloses messages in the context of the '174 Patent.

The crux of CCE's arguments against Baker is that it does not disclose "messages" of any kind, and there can be no disclosure of "at a start of a message transmission."[1] Although Baker does not use the

---

[1] *See, e.g.*, Response Br. at 2 ("In fact, the term "message" is not used in Baker."); *Id.* at 3 ("CCE responded that since Baker does not discuss "messages," it cannot disclose lowering the power of a transmission at the start of one."); *Id.* at 4 ("Instead, [the Board] found that Baker simply does not disclose messages of any form. Since Baker does not disclose messages at all, the Board's findings are not surprising and are correct."); *Id.* at 21 ("Second, Baker fails to anticipate the Challenged Claims because there is no disclosure of "messages" in Baker. Since there is no disclosure of "messages" in general, there can be no disclosure of "determining a transmit power difference . . . at a start of a message transmission" as required by all of the Challenged Claims."); *Id.* at 24 ("As mentioned above, the term "message" is not found in Baker."); *see also id.* at 2 ("As an initial point, Baker doesn't disclose messages of any kind.").

term "message," Baker discloses messages as information, data, or signals transmitted between a mobile station and a base station. For example, Baker discloses messages in the form of the ACK/NACK signals, which are acknowledgement (ACK) signal and non-acknowledgement (NACK) signal.

During the PTAB Oral Hearing, CCE's counsel conceded in no uncertain terms that the ACK/NACK signals disclosed in Baker are “messages” in the context of the ‘174 Patent:

> **JUDGE ANDERSON**: --the transmission of this acknowledged, no knowledge, ACK and NACK, whatever that is, is not a transmission of information that would be construed by us in the message? Appx714:1-4.
>
> **MR. BUMGARDNER [CCE’s counsel]**: It – **it may be construed as a message**, Your Honor, but I would note the petitioner’s position on this is that the start of the message, as it corresponds to Claim 1 of the ‘174 patent, begins before the **ACK/NACK messages**, if that’s what we want to call it. . .
>
> **JUDGE ANDERSON**: So we’re getting – we’re getting down to the – the limitation that talks about the start of a message. We really aren’t arguing about whether this ACK/NACK is not a message, are we? I mean, you – **you would agree that it is a message, wouldn’t you?**
>
> **MR. BUMGARDNER [CCE’s counsel]**: I would say an ACK/NACK, but for the purposes of this discussion.

> Your Honor, okay, it's – **it's a message. I won't – I will not dispute that**. . .
>
> . . . .
>
> **MR. BUMGARDNER [CCE's counsel]**: [W]hat Figure 4 shows is I'm transmitting at maximum power on the C and D channels. And then I have to send an **ACK/NACK message**, so I'm going to turn down the power on the C and D and then continue to transmit at maximum power during while I'm sending the **ACK/NACK message**."

Appx719:1-20 (emphasis added); Appx735:19-736:4 (emphasis added).

Besides the ACK/NACK signals, which CCE concedes are "messages" in the context of the '174 Patent, Baker describes transmission of other messages such as packet data or other signals. For example, Baker discloses "In another embodiment, the additional signals may carry information other than ACK/NACK signalling; for example, they may carry packet data (as in the proposed enhanced uplink in UMTS) or other signalling information." *See* Appx915 at ¶ [0033]; *see also* Appx913 at ¶ [0019] ("An external source of data 16 is coupled to a base band stage 18 in which data is formatted into packets. The data packets are prepared for transmission ....).

Baker discloses message transmission in a UMTS communication system. Specifically, Baker teaches transmitting data using two

physical channels, the DPDCH and DPCCH physical channels. *See* Appx914 at ¶ [0023] ("Two signals are often transmitted continuously and these are a dedicated physical data channel DPDCH and dedicated physical control channel DPCCH, these signals are shown in FIG. 1.")]. In testimony submitted to the Board, CCE's expert concedes that the DPDCH and DPCCH channels described in Baker are the physical channels used to transmit DCH data messages. *See* Appx2128 at ¶ 27 ("DCH is employed for transmission of data messages. DCH data messages (so called data blocks) are transmitted employing Physical Channels such as Dedicated Physical Data Channel (DPDCH) and Dedicated Physical Control Channel (DPCCH)."). CCE's expert further acknowledges that the DPDCH and DPCCH physical channels are used to transmit messages such as the EDCH message. *See* Appx2130 at ¶ 29 ("EDCH data messages are transmitted employing physical channels such as Enhanced-DPDCH, and Enhanced-DPCCH."). CCE cannot hide from these admissions by its own expert. The Board committed reversible error by disregarding CCE's concession that Baker discloses messages in the context of the '174 Patent.

## IV. Baker Discloses Determining Power Headroom At The Start of a Frame

CCE also argues that the transmission of the ACK/NACK messages in Baker are not precisely at the same time as the start of a frame for the Data Channel (DPDCH) and the Control Channel (DPCCH). *See* Response Br. at 14-15 ("Important to this appeal is the timing of the ACK/NACK signal relative to the time slots used by the DPCCH and DPDCH. In Baker, the timing of a transmission of an ACK/NACK signal and transmissions on the DPCCH and DPDCH are not related."). This is a red herring.

Whether the transmission of the ACK/NACK messages is precisely at the same time as the Data Channel and the Control Channel in Baker is irrelevant to the claim limitation of determining power headroom "at a start of a message transmission." The '174 Patent contemplates a situation where the start of message transmission for the remaining codes does not align in time with the start of message transmission for the first code. *See* Appx30-31 at 2:65-3:4 ("If no message transmission using the remaining code or codes is performed <u>**precisely at the time**</u> of the start of the message transmission using the first code, but instead is only initiated a short time later, then the transmit power for the remaining code or codes at

the point in time occurring **a short time later** can be used for the sum forming operation described.") (emphasis added); *see also* Appx32 at 5:40-42 ("The times of the TTI start of the two codes DCH and EDCH **can be different** from each other.") (emphasis added). Thus, the '174 Patent describes that any short-time gap between the start of the message transmission of the first code and the start of transmission for the remaining codes is immaterial in determining power headroom at a start of a message transmission.

## V. Baker Anticipates Regardless of Construction of "at a Start of a Message Transmission"

The claim does not require the "message" to have a particular length. The claimed "message" can be a single frame, such as the EDCH message described in the only embodiment of the '174 Patent, or the "message" can be two frames in length, such as the ACK/NACK messages shown in Figure 4 of Baker. But even if a message is longer than a single frame, Baker still discloses determining power headroom at the beginning of the message because every message will start at a frame boundary. *See* Appx2127-2128 at ¶26.

Baker discloses determining power headroom at the start of any frame or time slot of a message transmission. *See* Appx915 at Cl. 3

("the transmit power of the first signal is scaled **at the frame or time slot boundary** immediately preceding the transmission of the additional signal.") (emphasis added); *see also* Appx913 at ¶ [0004] ("In some systems, it is only possible to execute the reduction in transmit power of the first signal at particular time instants, such as a **frame- or timeslot-boundary**.") (emphasis added); Appx914 at ¶ [0030] ("However at **the boundary of the frame or time slot** immediately preceding the sending of an ACK or NACK, these amplitudes are adjusted ….")(emphasis added). CCE concedes that "Baker's real disclosure is that its power adjustments can happen **at the beginning of any time slot**, including time slots that also happen to be at the beginning of a frame." Response Br. at 28 (emphasis added).

Even if the Board's construction of "at a start of message transmission" is correct, Baker still anticipates the '174 Patent. It is undisputed that Baker discloses determining power headroom at the start of a frame or time slot of a message transmission. *See, e.g.*, Response Br. at 28. The only disclosed embodiment of a message in the '174 Patent is the EDCH message. As discussed above, the '174 Patent specifies that the start of the frame for an EDCH message corresponds

to the start of the message transmission for an EDCH message. This means that an EDCH message will always start at a frame boundary. So, Baker's disclosure of determining power headroom at the frame boundaries includes determining power headroom at the start of an EDCH message.

Baker’s disclosure of determining power headroom at the start of any frame or time slot of a message transmission is broader than the Challenged Claims of the ‘174 Patent, which is determining power headroom only at a particular time; i.e., at a start of a frame or time slot of a message transmission. When the message transmission is for a message with a transmission time interval or length of one frame (such as the EDCH message disclosed in the ‘174 Patent), determining power headroom at the start of any frame of a message transmission is determining power headroom at a start of the one and only frame. When the message transmission is for a message with a transmission time interval or length of two frames (such as the ACK/NACK messages disclosed in Baker and CCE admitted as “messages” in the context of the ‘174 Patent), determining power headroom at the start of any frame of a message transmission includes determining power headroom at a

start of the first frame and at a start of the second frame of a message transmission. When the message transmission is for a message with a transmission time interval or length of three frames or longer, determining power headroom at the start of any frame of a message transmission includes determining power headroom at a start of the first frame, at a start of the second frame, at the start of the third frame, and so on, of a message transmission.

## VI. Reed Discloses Determining Power Headroom For A Plurality of Codes

CCE concedes that Reed discloses determining and maintaining power headroom for a mobile station. *See* Appx901 at Abstract, Appx905 2:20-28; *see also* Response Br. at 15. Similar to the '174 Patent, Reed defines "headroom" as "the difference between the maximum power of the transmitter and the transmission power level required for a particular data rate." Appx905 at 1:29-31. In determining and maintaining power headroom for a mobile station that transmits two or more data streams, Reed provides that one data stream can be de-prioritized for the benefit of another data stream:

> If the mobile station desires to send two or more data streams (or hold voice and data connections at the same time), an addition[al] degree of freedom allows the mobile

> station to deliberately increase the headroom on one of the data streams to de-prioritize that data stream. This would result in, for example, a longer time to transmit a text message from the mobile station but allow a digital picture to be transmitted at an optimum data rate.

Appx906 at 4:14-21.

As Dr. Williams explained in his Reply Declaration:

> A person of ordinary skill in the art would understand that the above paragraph explains that more power can be allocated to higher-priority data streams by reducing power allocated to lower priority data streams. Otherwise, if the above paragraph was interpreted to require independently managed headroom for each data stream, as Dr. Dinan appears to maintain, the transmission power headroom for one data stream could not be allocated to a different higher priority data stream, eliminating the additional degree of freedom that the paragraph describes.

Appx1183 at ¶13.

Contrary to the Board's conclusion, Dr. William's Reply Declaration follows his prior statement in the Petition Declaration that "data streams in Reed are assigned different codes, each code having its own headroom." Appx828 at ¶110. Because Reed defines "headroom" as the "difference between the maximum power of the transmitter and the transmission power level required **<u>for a particular data rate,</u>**" Appx905 at 1:29-31(emphasis added), when the mobile station is transmitting two or more data streams using a plurality of codes, each

data stream or code will have a particular data rate and a transmission power level associated with that data rate. Dr. Williams' statement that "data streams in Reed are assigned different codes, each code having its own headroom" is explaining that Reed teaches each data stream can have its own data rate.

The Abstract for Reed describes "Modifications to headroom allow **data rates to be tailored** to specific channel variance conditions and battery conditions." Appx901 at Abstract (emphasis added). Similarly, Reed's description at 4:14-21 uses "headroom" to describe the additional degree of freedom allowed by adjusting the data rate of an individual data stream. *See* Appx906. When the data rate for text message data stream is reduced, the data rate for digital picture data stream can be optimized or increased. This is the only logical interpretation of Reed's disclosure; otherwise, it would not result in "a longer time to transmit a text message from the mobile station but allow a digital picture to be transmitted at an optimum data rate" as described in Reed.

The alleged inconsistency in Dr. Williams' declarations is misplaced. The Board erred by ignoring Dr. William's Reply

Declaration and finding that Reed teaches determining a separate headroom for each code, not determining a single headroom for a plurality of codes. *See* Appx16-18.

## CONCLUSION

For the foregoing reasons, Appellants respectfully request that this Court vacate the Board's Final Written Decision and remand the case for the Board to properly construe the '174 Patent's claims under the broadest reasonable interpretation standard and to conduct a proper invalidity analysis.

January 11, 2017

Respectfully submitted,

/s/ *Steven A. Moore*
Steven A. Moore
Matthew R. Stephens
Pillsbury Winthrop Shaw Pittman LLP
501 W. Broadway, Suite 1100
San Diego, CA 92101
(619) 234-5000

*Counsel for HTC Corporation*

*and ZTE (USA), Inc.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned counsel certifies that this brief:

(i) complies with the type-volume limitation of Rule 32(a)(7)(B)(ii) because it contains 4,092 words, including footnotes and excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 2010 and is set in Century Schoolbook font in a size equivalent to 14 points or larger.

/s/ *Steven A. Moore*

January 11, 2017 Steven A. Moore

**CERTIFICATE OF SERVICE**

I hereby certify that on January 11, 2017, I served the foregoing Corrected Brief for Appellants on each party separately represented by CM-ECF.

Dated: January 11, 2017

/s/ *Steven A. Moore*
Steven A. Moore